**Raul Jose VALENCIA,**
**Plaintiff–Appellee,**

v.

**Garry D. WIGGINS, Defendant–**
**Appellant.**

No. 91–8018.

United States Court of Appeals,
Fifth Circuit.

Jan. 18, 1993.

Douglas M. Becker and Roger Moore, Gary & Becker, Austin, TX, for defendant-appellant.

J. Patrick Wiseman and Edward Tuddenham, Richards, Wiseman & Durst, Austin, TX, for plaintiff-appellee.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This appeal results from a pretrial detainee's civil rights suit against a county jailer. The district court found that the jail official used force greatly in excess of that which was reasonable under the circumstances. The court also found that the official acted maliciously toward the pretrial detainee with the intention to punish him, and that qualified immunity was not available. A money judgment was rendered in favor of the detainee. Concluding

that the district court's findings of fact were not clearly erroneous, we find the jail official not entitled to qualified immunity. And, agreeing with the district court that the jail official used force maliciously and sadistically with the intent to punish the pretrial detainee, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. THE JAILHOUSE INCIDENTS

As a result of an undercover police operation conducted by Defendant–Appellant Gary D. Wiggins, Plaintiff–Appellee Raul Jose Valencia was arrested on drug charges. On July 3, 1987, Valencia was committed to Brewster County (Texas) Jail. Shortly thereafter, Wiggins ceased work as an undercover agent and became Acting Chief Deputy of Brewster County Jail, responsible for, among other things, supervision of the jail.

One evening three weeks into his pretrial detention, Valencia took part in a jail disturbance in which the inmates made excessive noise and threw objects out of cells. The next day, the inmates, including Valencia, again created a disturbance by singing and making noise. Jailer Joaquin Jackson requested that the inmates quiet down. When they refused, Jackson summoned Wiggins, who reiterated Jackson's command. Unlike most other inmates, however, Valencia and his cellmate, Gilbert "Bebo" Espinosa, continued to make noise. Wiggins then ordered Valencia out of his cell. Valencia refused to come out, and instead asked why he was being singled out. At that point, Wiggins entered Valencia's cell to enforce his order. Participants and witnesses give quite different accounts of what transpired next. Valencia contends that Wiggins grabbed him by the hair and bashed his head repeatedly against the cell bars. Wiggins asserts, on the other hand, that Valencia's head accidentally hit the bars during this altercation. Espinosa testified, in what perhaps is a third version of events, that Valencia's head hit the bars when he stiffened his body to resist removal from the cell. Irrespective of those conflicting reasons, there is general agreement on what happened next: Wiggins applied a choke hold that left Valencia momentarily unconscious. After getting him to the floor, Wiggins put Valencia in handcuffs.

Wiggins and the other jailer then took Valencia downstairs to the drunk tank. Valencia testified that, after Wiggins ordered the other jailer to close the door and wait, he (Wiggins) went into the drunk tank with Valencia and struck him at least three times while he was handcuffed and on his knees. Not surprisingly, Wiggins's version of events is quite different. He testified that he and the other jailer escorted Valencia to the drunk tank, removed the handcuffs, shut the door, and left Valencia alone in the cell. Wiggins claims that he never struck Valencia.

Two days after this incident, and for reasons that are not stated in the record, Valencia was moved to the Pecos County Jail. But because that jail had no room, Valencia was moved once again, this time to the Law Enforcement Center. There, the interviewing jailer noted that Valencia had visible injuries, including bruises on his face and scratches and cuts on his throat, but concluded that these injuries did not require immediate medical attention. Several days later, Valencia was visited by an attorney who also noticed the bruises and scratches. Although Valencia testified that his voice was damaged permanently as a result of the choke hold applied by Wiggins in the upstairs incident, both his cousin and a jailer at the Brewster County Jail (who was also a friend of Valencia's family), testified that they noticed no change.

### B. THE DISTRICT COURT'S DECISION

Valencia filed this civil rights action, under 42 U.S.C. § 1983, complaining that Wiggins and another jailer violated his constitutional rights by using excessive force during his incarceration in the Brewster County Jail.[1] Subsequently, Wiggins filed

---

1. The complaint originally named as defendants the County of Brewster, the District Attorney whose district included Brewster County, the Sheriff of Brewster County, the Head Jailer of

a motion for summary judgment on the basis of qualified immunity. Rather than ruling immediately on Wiggins's motion, however, the trial judge carried it with the case.

After a bench trial, the district court found for Valencia, and ordered Wiggins to pay damages to Valencia in the amount of $2,500.[2] The district court made the following factual findings: Valencia refused to come out of his cell; to enforce his order, Wiggins entered the cell; "[a] wrestling match ensued during which Wiggins hit Valencia's head against the jail bars and applied a 'choke hold' rendering Valencia momentarily unconscious"; Wiggins's methods of enforcing jail discipline were "unreasonable and clearly excessive"; Wiggins went into the drunk tank with Valencia and shut the door; "Wiggins then struck Valencia while he was cuffed and on his knees at least three times"; and Valencia's scratches, cuts, and bruises were serious, but did not require medical attention.

As to the applicable law, the district court concluded that because Valencia was a pretrial detainee, the case involved the Fourteenth Amendment's protection against summary punishment, not the Fourth Amendment's prohibition of "unreasonable seizures" or the Eighth Amendment's prohibition of "cruel and unusual punishments." And finding Wiggins's use of force to be both excessive and malicious and Valencia's physical injuries to be "severe," the district court concluded that Va-

lencia met his burden under *Shillingford v. Holmes*,[3] the case which, at the time of the incident, articulated this court's substantive due process standard for claims of excessive use of official force. Additionally, the court found that Wiggins was not entitled to qualified immunity, presumably because this court stated in *Stevens v. Corbell*,[4] that immunity is not available in excessive force cases. Finally, in a supplemental order entered two months after trial, the district court granted Valencia approximately $27,600 in attorney's fees and costs.

Wiggins appealed to this court.

## II. ANALYSIS

### A. CONSTITUTIONAL BASIS

■ Wiggins argued in this pretrial detainee excessive force case that the district court should have used the Fourth Amendment's excessive force standard, set forth by the Supreme Court in *Graham v. Connor*,[5] and adopted with modification by this court in *Johnson v. Morel*.[6] Valencia, on the other hand, urged this court to continue using *Shillingford*,[7] which articulates a substantive due process standard derived from *Johnson v. Glick*,[8] the Second Circuit's seminal decision for excessive force claims.

■ We do not believe that the Fourth Amendment provides an appropriate constitutional basis for protecting against delib-

---

Brewster County, another jailer of the Brewster County Jail, a Deputy Sheriff of Brewster County, the Brewster County Judge, and the Brewster County Attorney. Valencia later amended his complaint to remove claims against the County Judge, County Attorney, and the District Attorney.

2. Upon motion, the district court involuntarily dismissed claims against the head jailer, sheriff, deputy sheriff, and Brewster County.

3. 634 F.2d 263 (5th Cir.1981).

4. 832 F.2d 884, 890 (5th Cir.1987) (finding it "well-settled in this Circuit that knowing use of excessive force in booking an arrestee violates the arrestee's constitutional rights").

5. 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

6. 876 F.2d 477 (5th Cir.1989) (en banc) (per curiam). Under *Morel*, a plaintiff alleging excessive force in violation of the Fourth Amendment had to prove three elements: "(1) a significant injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was ■ objectively unreasonable." *Id.* at 480. *Knight v. Caldwell*, 970 F.2d 1430, 1432 (5th Cir.1992), recently determined that the Supreme Court's decision in *Hudson v. McMillian*, —— U.S. ——, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), overturned *Morel*'s significant injury element.

7. 634 F.2d at 263.

8. 481 F.2d 1028 (2d Cir.1973).

erate official uses of force occurring, as in this case, *after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time. Our reasons for so deciding are threefold. First, we believe that the Fourth Amendment itself provides weak textual support for such an extension. As the Fourth Amendment protects against unreasonable "seizures," it seems primarily directed to the *initial* act of restraining an individual's liberty,[9] such as an investigatory stop or arrest. (*Graham* itself offers no explicit suggestion as to when a Fourth Amendment seizure comes to an end, although its facts indicate that a seizure under the Fourth Amendment does not end the moment the police gain custody and control over a suspect.[10])

Subsequent to *Graham*, a number of circuits endorsed the extension of the Fourth Amendment to the period between arrest and charge,[11] or through the period in which an arrestee remains in the arresting officer's custody.[12] But we have discover-ed no case in which a court has ruled that the Fourth Amendment continues to protect against the official use of force in the attenuated stage of pretrial detention at issue here.[13] Therefore, without deciding whether the concept of continuing seizure is appropriate in other contexts, we find that the concept of "seizure" in the Fourth Amendment is not so capacious or elastic as to cover pretrial detention three weeks after the initial arrest, the period at issue in this case.

Our second reason for not extending the Fourth Amendment to cover this period of pretrial detention is that the Supreme Court, in several recent cases, has been markedly unwilling to concede that the Fourth Amendment protects inmates after incarceration.[14] For instance, in *Bell v. Wolfish*,[15] the Supreme Court refused to hold that a pretrial detainee has a privacy interest in his person that is protected by the Fourth Amendment. (The Court then proceeded to find that, even if the Fourth Amendment were implicated, the institution's practice of requiring detainees to expose their body cavities for visual inspec-

---

**9.** *See Wilkins v. May*, 872 F.2d 190, 192–93 (7th Cir.1989) ("A natural although not inevitable interpretation of the word 'seizure' would limit it to the initial act of seizing, with the result that subsequent events would be deemed to have occurred after rather than during the seizure."). *But see, e.g., Justice v. Dennis*, 834 F.2d 380, 387–88 and n. 12 (4th Cir.1987) (en banc) (Phillips, J., dissenting) (arguing that "seizure" does not relate only to the event of "arrest," but applies as well when individuals already in custody suffer further restrictions on their liberty), vacated 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989).

**10.** *Graham* applied the Fourth Amendment's objective reasonableness standard even though the plaintiff was handcuffed—and thus securely in police custody—during the time in which the police allegedly tormented and beat him. *See, e.g., Henson v. Thezan*, 717 F.Supp. 1330, 1335 (N.D.Ill.1989) (*Graham* "appears to undercut *Wilkin*'s view that a seizure ends at the moment the police gain custody and control over the suspect.").

**11.** *Austin v. Hamilton*, 945 F.2d 1155, 1162 (10th Cir.1991) (holding that the Fourth Amendment's objective reasonableness standard applies post-arrest up to the arrested suspect's first judicial hearing); *Hammer v. Gross*, 884 F.2d 1200, 1204 (9th Cir.1989), vacated en banc on other grounds, 932 F.2d 842 (9th Cir.1991) (Fourth Amendment applies to force used to compel drunk driving arrestee to consent to chemical tests because force constituted search incident to arrest); and *Calamia v. New York*, 879 F.2d 1025, 1034–35 (2d Cir.1989) (Fourth Amendment applies to search incident to arrest).

**12.** *See, e.g., Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir.1989) ("Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.").

**13.** *See, e.g., Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir.1990) (assuming that arrestee's "presence in the jail and the completion of the booking marked the line between 'arrest' and 'detention' ").

**14.** *See* Wayne R. LaFave, 4 *Search and Seizure* § 10.9, at 102–27 (West 1987). *But see Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (Fourth Amendment is implicated when state compels suspect to undergo surgery to retrieve evidence).

**15.** 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

tion after contact visits with persons from outside the institution was reasonable). Similarly, in *Hudson v. Palmer*,[16] the Court concluded that the Fourth Amendment protects neither a prisoner's privacy interest in his prison cell nor his possessory interest in personal property contained in his cell. We also find it significant that *Whitley v. Albers*,[17] which resolved that the Eighth Amendment is the primary source of protection against the official use of force for convicted prisoners, never even considered the Fourth Amendment's prohibition against unreasonable seizures as an additional source of substantive protection.

Third, and most importantly, the Supreme Court's decisions in *Graham* and *Bell* indicate that the due process clause in the Fifth (or Fourteenth) Amendment is the appropriate constitutional basis for pretrial detainee excessive force suits.[18] Although *Graham* left open whether the Fourth Amendment applies after arrest, it nevertheless made clear that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."[19] Likewise, in *Bell*, the Court concluded that the Court of Appeals had properly relied on the due process clause in considering claims of pretrial detainees. *Bell* holds that conditions and restrictions of pretrial detention amount to deprivations of liberty without due process if those restrictions or conditions "amount to punishment of the detainee."[20] Writing for the Court, then-Associate Justice Rehnquist explained:

> Not every disability imposed during pretrial detention amounts to "punishment"

in the constitutional sense, however.... A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.[21]

Our conclusion that *Graham* and *Bell* indicate the Supreme Court's intention that lower courts determine whether force exerted against a pretrial detainee constitutes punishment under the Due Process Clause is consistent with this Court's decision in *Ortega v. Rowe*,[22] and the Seventh Circuit's recent pronouncement in *Titran v. Ackman*.[23]

## B. PRETRIAL DETAINEE EXCESSIVE FORCE STANDARD

In our determination of what standard of due process applies to claims of excessive

---

**16.** 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

**17.** 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986).

**18.** *See also Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977) ("Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.").

**19.** 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10.

**20.** 441 U.S. at 535, 99 S.Ct. at 1872.

**21.** *Id.* 441 U.S. at 537–39, 99 S.Ct. at 1873 (internal citations omitted).

**22.** 796 F.2d 765, 767 (5th Cir.1986) ("*Bell* first directs us to the due process clause rather than the Eighth Amendment in considering claims of pretrial detainees.").

**23.** 893 F.2d at 147 ("Did the state punish? ... is the right question when a captive of the state claims that she has been attacked by her jailors."). *See also,* Martin A. Schwartz and John E. Kirklin, 1 *Section 1983 Litigation*, § 3.9, at 165–66 (Wiley 1991).

use of force brought by pretrial detainees, we are first guided by *Bell.* *Bell* concerned the constitutionality of conditions or restrictions of pretrial detention and concluded that the proper inquiry is whether these conditions amount to punishment of the detainee. To determine if a condition or restriction amounts to "punishment," a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent proof of an official's expressed intent to punish, the determination of whether a condition is "punishment" turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.

While this inquiry works well for claims of improper conditions or restrictions, it does not lend itself to analysis of claims of excessive use of force in controlling prison disturbances. In *Bell*, the Court stated that the government must be able to take steps to maintain security and that "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment...."[24] *Bell* further noted that there is no reason to distinguish between pretrial detainees and convicted inmates in reviewing challenged security practices because there is no basis to conclude that pretrial detainees pose any lesser security risk that convicted inmates.[25]

■ For these reasons, we conclude that excessive use of force claims by pretrial detainees should not be analyzed under *Bell*'s conditions of confinement standard. Instead, we are guided by the standard announced in *Whitley* and *Hudson.* While these cases specifically addressed claims of excessive use of force brought by convicted prisoners, it is impractical to draw a line between convicted prisoners and pretrial detainees for the purpose of maintaining jail security. Moreover, the Court indicated in *Hudson* that many of its concerns in *Whitley* were not limited to Eighth Amendment claims but "arise *whenever* guards use force to keep order."[26] It further observed that claims based on excessive force and claims based on conditions of confinement are different in kind.[27]

■ Therefore, when a court is called upon to examine the amount of force used on a pretrial detainees for the purpose of institutional security, the appropriate analysis is that announced in *Whitley* and *Hudson:* whether the measure taken inflicted unnecessary and wanton pain and suffering depends on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."[28]

Often, of course, there will be no evidence of the detention facility official's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent.[29] The trier of fact would need to examine "the need for the application of force," and the "threat 'reasonably perceived" by the detention facility official.'"[30] When appropriate, the trier of fact must reflect in this calculus that the detention facility official may have had to act quickly and decisively. The trier of fact should also consider "any efforts to temper the severity of a forceful re-

---

**24.** 441 U.S. at 540, 99 S.Ct. at 1874.

**25.** *Id.* at 546 n. 28, 99 S.Ct. at 1878 n. 28.

**26.** — U.S. at ——, 112 S.Ct. at 998.

**27.** *Id.* — U.S. at ——, 112 S.Ct. at 1000.

**28.** *Id.* — U.S. at ——, 112 S.Ct. at 998, citing *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085.

**29.** Our recent decision on remand in *Hudson* summarized some of the relevant objective factors:

1. The extent of the injury suffered;
2. The need for the application of force;
3. The relationship between the need and the amount of force used;
4. The threat reasonably perceived by the responsible officials; and
5. Any efforts made to temper the severity of the forceful response.

*Hudson v. McMillian,* 962 F.2d 522, 523 (5th Cir.1992).

**30.** *Hudson,* —— U.S. at ——, 112 S.Ct. at 999.

sponse."[31] "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.' "[32]

Our conclusion that *Whitley* and *Hudson* provide the correct standard for excessive force suits brought by pretrial detainees means that this Circuit's test in *Shillingford* has no continuing force.[33] Neither *Whitley* nor *Hudson* requires that a detention facility official's conduct be so excessive and outrageous that it "shocks the conscience." And it is clear that *Shillingford*'s "severe" injury element did not survive *Hudson*.

▮ Here the district court found, as to the upstairs incident, that Wiggins's use of the choke hold and other force used to subdue a non-resisting Valencia and render him temporarily unconscious was unreasonable and was an excessive use of force. The district court further found that the force Wiggins inflicted on Valencia in the drunk tank while Valencia was handcuffed, kneeling, and non-resisting "was for no other purpose than to punish him prior to any adjudication of wrong doing[,] was clearly excessive and was not in good faith." The court specifically found Wiggins's actions to be "excessive, maliciously and sadistically applied."

As such, we have no difficulty finding that, in both the upstairs and downstairs incidents, Wiggins used force maliciously and sadistically to cause harm, not in a good-faith effort to maintain or restore discipline. Neither do we have difficulty deciding that the district court was not clearly erroneous in finding Wiggins's use of force grossly disproportionate to the need

for action and inspired by malice. The district court credited Valencia's testimony that he did not resist Wiggins at any time, either in the cell or in the drunk tank, and we see no basis for reversing that finding. The same is true for the district court determination's that Wiggins's malice is evident from the very excessiveness of his conduct—this was no "careless or unwise excess of zeal," as Wiggins now asserts.

## C. QUALIFIED IMMUNITY

▮ Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[34] Whether a defendant asserting qualified immunity may be personally liable turns on the objective reasonableness of the defendant's actions assessed in light of clearly established law.[35]

▮ In this case, Wiggins asserted the defense of qualified immunity in a motion for summary judgment. But rather than rule on the motion, the district court elected to carry it with the case. Then, at close of trial, the court ruled against Wiggins, stating without elaboration that "[u]nder the circumstances of this case Wiggins is not entitled to qualified immunity."

We are not certain whether the district court decided that Wiggins could not *assert* a qualified immunity defense under *Shillingford,* or that Wiggins was not *entitled* to qualified immunity because his behavior was objectively unreasonable. In support of its ruling, the district court cited dictum in *Stevens v. Corbell,*[36] to the effect that "the defense of qualified immunity is unavailable to a police officer who the plaintiff has alleged thus used excessive

---

**31.** *Id.*

**32.** *Id.,* citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085.

**33.** The Seventh Circuit in *Titran,* 893 F.2d at 147–48, similarly overruled *Gumz v. Morrissette,* 772 F.2d 1395 (7th Cir.1985), its substantive due

process standard, which, like *Shillingford,* derived from *Glick.*

**34.** *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

**35.** *See id.,* 483 U.S. at 639, 107 S.Ct. at 3038.

**36.** 832 F.2d at 890.

force." [37]   Later, in *Brown v. Glossip*,[38] this court interpreted *Stevens* as suggesting that the defense of qualified immunity might not be available to an official accused of employing excessive force under the *Shillingford* standard because *Shillingford*'s malice prong cannot be reconciled with the good faith requirement of qualified immunity. After those decisions were rendered, however, we concluded that "scienter is not material to qualified immunity.... It is therefore irrelevant whether the defendants in this case acted with intent to injure as long as their conduct was objectively reasonable." [39]  Wiggins, therefore, is not foreclosed from asserting qualified immunity. Whether he is entitled immunity from liability, however, turns on whether his use of force was objectively reasonable.

The objective reasonableness of Wiggins's conduct must be measured with reference to the law as it existed at the time of the conduct in question.[40] The force which Valencia alleges was applied to him excessively was used in 1987, at which time *Shillingford*'s substantive due process standard was the clearly established law in this circuit for excessive force claims brought by pretrial detainees. In *Shillingford*, as noted earlier, we held that to maintain an excessive force claim a plaintiff must prove that the defendant's action "caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience...." [41]

Wiggins insists that he is immune from liability because Valencia's injuries are not sufficiently "severe," as required by *Shillingford*. While we acknowledge that there is case law in this circuit suggesting that injuries such as those sustained by Valencia might not constitute "severe" injury under *Shillingford*, so too is there case law indicating that such injuries are indeed "severe." Recitation in appellate opinions of such subjective determinations as the relative severity of an injury do not lend themselves to useful or instructive comparison.[42]

37. *Id.* at 890.

38. 878 F.2d 871, 873 n. 2 (5th Cir.1989). *See also Coon v. Ledbetter*, 780 F.2d 1158, 1164 (5th Cir.1986).

39. *Pfannstiel v. Marion*, 918 F.2d 1178, 1182 (5th Cir.1990), citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) ("an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner").

40. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

41. 634 F.2d at 265.

42. Perhaps this point is best made perhaps by a partial recapitulation of this court's decisions on the element of injury. The following cases found injuries to be "severe" under *Shillingford*: *Shillingford*, 634 F.2d at 266 (lacerated forehead, leaving a scar, sustained when a police officer smashed a camera with a nightstick while photographer was taking a picture); *Roberts v. Marino*, 656 F.2d 1112, 1115 (5th Cir. 1981) (multiple bruises and scars to the head and body, resulting from a severe beating); *Hinshaw v. Doffer*, 785 F.2d 1260, 1267 (5th Cir. 1986) (multiple contusions and lacerations resulting in a two day hospital stay after a beating by an officer, continuing occasional numbness in one arm); and *Mouille v. Live Oak*, 918 F.2d 548, 552 (5th Cir.1990) (pinched nerve in the leg).

The following cases found injuries to be "significant" under *Morel*: *Morel*, 876 F.2d at 480 (handcuffs causing scars and resulting in disabling from employment for two weeks); *Hay v. Irving*, 893 F.2d 796, 798 (5th Cir.1990) (bruises to head and shoulders, severe bruise to leg, extensive swelling of jaw with medical testimony that injuries were severe, pinched nerve in the leg); and *Adams v. Hansen*, 906 F.2d 192 (5th Cir.1990) (lacerated fingers requiring sutures).

In these cases, injuries were deemed not "severe" under *Shillingford*: *Raley v. Fraser*, 747 F.2d 287, 289 (5th Cir.1984) (bruises on arm, scrapes on face, welts raised by handcuffs, choke hold with sore throat and hoarse voice for two weeks); *Mark v. Caldwell*, 754 F.2d 1260, 1261 (5th Cir.1985) (slaps to the face); *Mouille*, 918 F.2d at 554 (one plaintiff: transient fear for the safety of another; another plaintiff: small red mark and fear for safety of unborn child); *Pfannstiel*, 918 F.2d at 1185 (one plaintiff: neck strain requiring the wearing of a collar for about a week; second plaintiff: scratches on arms and hurt throat from being choked; third plaintiff: aggravation of pre-existing high blood pressure and marks on wrists from handcuffs).

The trier of fact, in this case the trial judge, found Valencia's injuries to be "severe." To the extent we can productively compare the description of Valencia's injuries in the record with the descriptions of injuries reported in appellate opinions from other excessive force cases, we conclude that the district court's findings of fact here do not markedly deviate from those in other cases.[43] Therefore, applying the "clearly erroneous" standard of review, we refuse to overturn on appeal the district court's finding of fact that Valencia's injuries were "severe" under *Shillingford.*

## III. CONCLUSION

■ When, as here, the incidents of arrest have long since been completed and the pretrial detainee remains in detention, it is the Due Process Clause that provides the appropriate constitutional basis for determining whether a detention official's use of deliberate force on such a detainee is excessive.[44] Neither the Unreasonable Search and Seizure Clause of the Fourth Amendment nor the Cruel and Unusual Punishment Clause of the Eighth Amendment is applicable.

■ In light of the Supreme Court's statements in *Bell* and *Graham* that the appropriate question under the Due Process Clause is whether the detention official's use of force was with the intent to punish the pretrial detainee, and guided by that Court's recent decisions in *Whitley* and *Hudson* on excessive force claims in the context of prison disturbances, we hold that this circuit's excessive force standard as previously set forth in *Shillingford* is no longer the appropriate one for testing claims of excessive force brought by pretrial detainees. Henceforth, the question in this circuit for suits brought by pretrial detainees alleging excessive use of force in the context of a prison disturbance, is that stated in *Hudson:* whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. The focus of this standard is on the detention facility official's subjective intent to punish. But, in determining such intent, the calculus of the trier of fact must include such objective factors as the extent of injuries suffered, the apparent need for the application of force, the degree of force exerted, the threat reasonably perceived by the detention facility official, and the need to act quickly and decisively.

Here, the finding of the district court that the deliberate force used against Valencia by Wiggins was excessive and unreasonable under the circumstances, and was applied maliciously and sadistically, was not clearly erroneous. As such, the district court did not err in concluding that Wiggins intended to punish Valencia—not to restore order or maintain discipline in the jail. Neither did the district court err in holding that Wiggins was not entitled to qualified immunity. In all respects, therefore, the judgment of the district court is

AFFIRMED.

In these cases, injuries were found not "significant" under *Morel: Wisniewski v. Kennard,* 901 F.2d 1276, 1277 (5th Cir.1990) (two punches in the stomach and transient fear when officer placed his gun in the arrestee's mouth and threatened to blow his head off); *Wesson v. Oglesby,* 910 F.2d 278, 283 (5th Cir.1990) (choke hold causing plaintiff to briefly lose consciousness); *Wise v. Carlson,* 902 F.2d 417, 417–28 (5th Cir.1990) (bruises to chest and forearm, hematoma on eyelid); *Mouille,* 918 F.2d at 554 (one plaintiff: transient fear for safety of another; another plaintiff: small red mark and fear for safety of unborn child).

**43.** *See* cases cited at note 42.

**44.** Precisely when the arrest mode ceases and the pretrial detainment mode begins remains an unanswered question, albeit one of increasingly diminishing importance in excessive force cases given the continued convergence of the various tests under the Fourth, Eighth and Fourteenth Amendments for maltreatment of arrestees, detainees or convicted prisoners, respectively. Under any test, the instant jailhouse altercations occurred well after all incidents of Valencia's arrest had ceased, so an effort to write a bright line of demarcation between arrest and detention here would produce obiter dicta at best. We therefore leave to a future panel the task of addressing that issue when the appropriate factual setting presents itself.