Ron E. ROBINSON, Plaintiff,

v.

Craig BROWN, et al., Defendants.

No. 95–6492–CIV.

United States District Court,
S.D. Florida.

Nov. 13, 1997.

Ron E. Robinson, Lake City, FL, pro se.

Richard A. Giuffreda, Purdy, Jolly & Giuffreda, P.A., Fort Lauderdale, FL, for Defendants.

## FINAL JUDGMENT

GOLD, District Judge.

### I. *Introduction*

1. Ron E. Robinson, who is currently confined at Columbia Correctional Institution, has filed a *pro se* Civil Rights complaint pursuant to Title 28, 42 U.S.C. Section 1983 against Defendants Craig Brown, John Melbourne, and the Broward County Sheriff's Department, alleging excessive use of force by the Broward County Deputy Sheriffs upon his arrest for burglary in May of 1993, and denial of adequate medical care for his injuries following his arrest and after he was confined at the Broward County jail. Service was not ordered upon the Broward County Sheriff's Department because it does not qualify as a person within the meaning of 42 U.S.C. Section 1983. It was dismissed as a party by virtue of the Court's order dated September 30, 1996 [D.E. 52]. In addition, by that order, summary judgment was granted as to Defendants Brown and Melbourne on

the denial of the medical claim, and in favor of Defendant Melbourne on the excessive force claim.

2. This Court has jurisdiction pursuant to Title 28, U.S.C. Section 1331 and Title 28, U.S.C. Section 1343(a)(3).

3. A bench trial [in that neither side requested a jury trial] was held on November 12, 1997. At that time, the Court heard from Plaintiff Robinson, Defendant Craig Brown, and other defense witnesses. The issue tried was limited to whether Defendant Brown violated Plaintiff's civil rights by subjecting him to a deprivation of his rights and privileges secured and protected by the Fourth and Fourteenth Amendments to the United States Constitution by using excessive force against him during his lawful arrest, and, if so, what damages should be awarded to Plaintiff Robinson as a proximate result.

Based on the testimony and evidence presented, and this Court's opportunity to observe and determine the credibility of the witnesses, the Court hereby enters the following findings of fact, conclusions of law, and judgment.

## II. *Findings of Fact.*

4. Robinson was arrested for burglary on May 19, 1993, by Deputies Brown and Melbourne. He admitted committing the burglary and fleeing from the scene. He testified that he decided to "give himself up." He stated that during the arrest he was beaten, kicked, and slammed to the ground by Deputy Brown and was handcuffed by Deputy Melbourne. He stated that he did not resist arrest and there was no need for the use of excessive force. He claimed in his Complaint [although he did not recollect at trial] that he was bleeding from his wrist because of the handcuffs and bleeding from his palms, and that he experienced pain in his shoulder. Although Robinson alleged in his Complaint that Melbourne and Brown took him to North Broward Hospital for treatment, he had no recollection at trial of being taken to the hospital. He conceded on cross-examination that he was drinking alcohol prior to the

burglary and had smoked crack cocaine earlier that day. He further testified at trial, although no similar allegation was made in the Complaint, that Deputy Brown threw him on the ground onto a blanket at the police substation after his arrest and poured a painful solution on his hands. He did not recollect being treated by paramedics at the police substation.

5. The greater weight of the more credible evidence establishes different facts. On May 13, 1993, at approximately 10:00 P.M., officers from the Broward County Sheriff's Department responded to the scene of a possible burglary at a condominium complex located in Lauderhill Lakes, Florida. Upon his arrival at the scene, Deputy Melbourne observed an individual attempting to push a television set through the window of an apartment located on the ground floor. Upon seeing the Deputy, the individual fled through the apartment towards the rear. Melbourne heard the sound of glass breaking and, as he proceeded to the rear of the apartment, observed a black male dive through the window and land on the ground with his arms outstretched. Melbourne identified himself, drew his weapon and ordered the man to stop. The man hesitated at first, but then ignored the command, and fled South, running towards Oakland Park Boulevard, with Melbourne also chasing him on foot. Melbourne lost sight of him, but then heard over his police radio that the suspect was apprehended. At the time he arrived at the scene of the arrest, he observed the suspect on the ground and bleeding from his forearms.

Deputy Barnes also arrived at the scene in his Broward police car in response to the burglary in progress call. Deputy Melbourne arrived immediately before him. Both approached with their headlights off. He watched Melbourne leave his police vehicle and run to the rear of the residence. He followed to back up Melbourne. He saw a television being pushed out of a small window at the rear of the residence. He heard Melbourne identify himself to the suspect and advise him to remain on the ground. He

then saw Melbourne running after the suspect with his gun drawn. Barnes gave a BOLLO description of the situation over his police radio. He ran after Melbourne but lost sight of him. He returned to the scene. He observed broken glass in the area of the rear window.

Officer Canada–Wurms testified that she arrived separately, and observed Melbourne chasing the suspect on foot. She observed the suspect running. She pursued in her police vehicle, and blocked his way. The suspect turned and fled in the opposite direction. At no time did he attempt to "give himself up." She radioed to other law enforcement officers of the suspect's flight. She then pursued the suspect and encountered another law enforcement officer in his vehicle. This was Deputy Craig Brown. Canada–Wurms advised Brown of the direction in which she had seen the suspect fleeing.

Brown testified that he heard the call for a "burglary in progress." His assignment was to respond to such calls. He heard over the radio that the deputies on the scene were in foot pursuit. He activated his lights and siren and proceeded on Oakland Park Boulevard in a westerly direction. He heard additional transmissions as to the suspect's description and direction of travel. He saw the suspect running eastbound on Oakland Park Boulevard. He pursued the suspect and attempted to block his escape, using his vehicle. Brown exited from his car, chased the suspect who was running away from him at a full sprint. Brown chased and then tackled him on the grassy median strip of Oakland Park Boulevard, where he [not Melbourne] placed handcuffs on the individual. Brown noticed that the man was covered with blood, as a result of having contact with him. At no time did Brown kick or punch him. At no point did the suspect attempt to "give himself up" or surrender. Brown used only the minimum and necessary amount of force in order to secure and arrest the suspect and did not use force to inflict unnecessary and/or wanton pain and suffering upon him or use force in a manner that was malicious and sadistic for the very purpose of causing harm.

Deputy Melbourne arrived at the scene of the apprehension, where the suspect, later identified as Robinson, was apprehended. When Melbourne approached, Robinson let his body go limp. He refused to cooperate. It took both Melbourne and Brown to put him in Brown's vehicle. Per standard procedure for a fleeing felon, leg shackles were used. Brown called paramedics to meet them at the sub-station. He then took Robinson to the District sub-station for medical treatment. At no time did Brown apply any medical treatment to Robinson. He observed treatment later being applied by the paramedics.

When Deputy Canada–Wurms arrived at the scene of the apprehension, and approached Brown and the suspect, Brown already had Robinson in custody. Deputy Canada–Wurms returned to the crime scene to take photographs, and found blood at the back of the apartment that had been burglarized.

After he was transported to the District Office of the Sheriff's Department for medical attention, Robinson was taken to the hospital where he received further treatment for hand wounds and a laceration of the palm was sutured. The initial Broward Sheriff's dispatch in the case was at approximately 10:10 p.m. on May 19, 1993. The North Broward Hospital records show that the plaintiff was received at that institution by 2:05 a.m. on May 20, 1993.

The hospital medical records dated May 20, 1993, reflect no complaint by Robinson to the emergency room physician about any injury to his shoulder, and no x-ray of the shoulder was taken at that time. The hospital records also contain nothing about bleeding lacerations on the plaintiff's wrists caused by handcuffs. The sole injuries noted on the hospital emergency room report were "glass cut[s] to both hands," and "laceration" of the plaintiffs' "palm." The emergency room physician, Dr. Williams, had no recollection of such injuries.

Robinson's sole complaint noted in his chronological medical record on May 20,

1993, upon his arrival at the county jail, is his statement, "I had this cut to my hand stitched at the hospital today." (Progress Notes for 5/20/93). Robinson did not begin to complain to jail medical staff about his shoulder until May 26, 1993. (Progress Notes for 5/26/93); Inmate Request for Health Services, dated May 26, 1993. The plaintiff's jail medical records reveal further requests and complaints by him regarding the shoulder on May 29 and 30. He was seen by the Physician's Assistant on June 1, and the nurse on June 3, 1993. The Inmate Request for Health Services dated June 3, pursuant to which the "triage nurse" examined him at 1:50 p.m. the same day, contains Robinson's statement in his own hand writing, as follows, verbatim: "I have this problem with my shoulder for some time now I can't explain this pain that going threw [sic] my arm from my arrest with those officer." The nurses's notes indicate "pain on palpation noted @ cervical spine C 4, 5 area no swelling or deformity," and that Robinson was prescribed pain medication and analgesic balm.

Robinson's chronological medical record at the jail shows that during subsequent days he was seen by medical staff for a variety of medical complaints, including his shoulder, and the medical records reveal that on June 10, 1993, after x-rays were taken, Dr. Dworkin diagnosed him as having a "non-displaced fracture of the acromion process" with the joint "intact." The records show that Robinson received continued care and medication for the shoulder injury, and by August 5, 1993, Dr. Dworkin found that the fracture had completely healed.

The Court notes that the plaintiff stated in his own handwriting to the medical staff on June 3, 1993, that he "can't explain" the pain in his shoulder which he was experiencing after his arrest. It is not insignificant that he did not tell the medical staff (as he alleges in the complaint) that he was in "severe pain in his shoulder" at the time of his arrest because the defendant officers had "beaten" him and "slammed" him to the ground and kicked him twice in the left upper back side of his shoulder. This was never mentioned

to the physician at the hospital emergency room on May 20, 1993, or to the medical staff at the jail in the days and weeks following his arrest. Nor was it alleged in the complaint. The Court finds that Robinson's claim to a shoulder injury arising out of the arrest is without merit.

### III. *Conclusions of Law.*

### A. QUALIFIED IMMUNITY AND EXCESSIVE FORCE.

(i). Qualified Immunity.

■ 6. The Supreme Court has developed an objective-reasonableness test for evaluating actions involving a government official's claim of qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus, unless a government official's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government official has immunity from suit. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Courson v. McMillian,* 939 F.2d 1479, 1486 (11th Cir.1991).

The Eleventh Circuit has developed a two-part analysis for applying the objective-reasonableness test to a qualified immunity defense. First the government official must prove he was acting within the scope of his discretionary authority when the complained-of acts took place. Once this requirement is met, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is satisfied by proof demonstrating that the government official's actions violated clearly-established constitutional law. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988)(quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)). In addressing the second component of the *Zeigler/Rich*

objective-reasonableness test, the court must conduct a two-part analysis. It must decide whether the law allegedly violated was clearly established at the time of the official's violation.[1] Then it must determine whether there is a genuine issue of fact concerning the government official's violation of that clearly-established law. *Courson,* 939 F.2d at 1488; *Rich,* 841 F.2d at 1563–65. It is undisputed that Defendant Brown was acting within the course and scope of his employment as police officers when the alleged wrongful acts occurred. Thus, the issue before this Court is whether the law was clearly established at the time of the alleged violation and whether the officers' conduct violated that clearly-established law.

(ii). Excessive Force.

■ 7. Courts apply Fourth Amendment standards of objective reasonableness in analyzing claims of excessive force. *Morreale v. City of Cripple Creek,* 113 F.3d 1246 (10th Cir.1997). Police officers will not be found to have violated the Fourth Amendment if their actions were "objectively reasonable" in light of the facts and circumstances confronting them at that time. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). The court must consider such factors as the need for force, the relationship between the need and the amount of force used, and the extent of the injury inflicted. *Byrd v. Clark,* 783 F.2d 1002, 1006 (11th Cir.1986); *Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980). "Not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. Reasonableness must account for the fact that police officers are sometimes forced to make split-second judgments under circumstances that are tense and rapidly evolving. *City of Hialeah v. Fernandez,* 661 So.2d 335, 340 (Fla. 3d DCA 1995). There is no bright-line standard regarding the use of force.

Thus qualified immunity applies unless the circumstances would inevitably lead a reasonable officer in the defendant's position to conclude that the force used was unlawful. *Gold v. City of Miami,* 121 F.3d 1442 (11th Cir.1997); *Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993). Furthermore, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, not by hindsight.

■ The use of force during the arrest on May 19, 1993, as viewed from the Deputy Brown's prospective, was not clearly unlawful. One factor to be considered in determining whether the use of force was necessary is whether the suspect was resisting arrest or fleeing. *Gold,* 121 F.3d at 1446; *Post,* 7 F.3d at 1559. Robinson fled from police and resisted arrest. The Court does not find credible his testimony that he desired to "give himself up." Deputy Brown had to tackle him from behind, straddle him, and handcuff him. Faced with a fleeing, uncooperative suspect, Deputy Brown could reasonably have concluded that the use of force was necessary.

Nor was the amount of force used on by Deputy Brown clearly unlawful. There is no constitutional prohibition against the use of *de minimis* force unless the force is the sort "repugnant to the conscience of mankind." *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). The amount of force used by Deputy Brown was not substantial because there is no evidence of physical injury related directly to the use of force. Rather, in light of the reference in the hospital medical records to "laceration" of the palm caused by glass, and the fact that Deputy Canada–Wurms found blood outside the apartment from which the plaintiff fled, it is apparent that the injury to the Robinson's palm which required sutures was caused by broken glass at the back of the apartment which was burglarized.

---

**1.** "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Courson,* 939 F.2d at 1488.

In one recently-decided case, the 11th Circuit held that qualified immunity protected police officers from liability from the plaintiff's claim of excessive force where the suspect suffered minor skin abrasions from handcuffs applied too tightly, but did not seek medical attention. *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir.1997). In another decision, the 11th Circuit held that qualified immunity applied to police officers who slammed a suspect against the wall, kicked his legs apart, and forced him to raise his hands in way that caused pain and required medical treatment. The court reasoned that because the amount of actual force used was minimal, and the injuries inflicted were minor, use of such force would not inevitably lead an government official in the officer's position to conclude that the force was unlawful. *Jones v. City of Dothan*, 121 F.3d 1456 (11th Cir.1997).

### IV. *Law Applied.*

8. The Court concludes that Deputy Brown is entitled to qualified immunity and, in any event, Robinson did not prove that Deputy Brown used excessive force against him during his arrest. The more credible evidence establishes that Robinson was attempting to avoid arrest and was fleeing from the crime scene, that only the amount of force necessary to apprehend and restrain him was used, and that no force was used against him for the purpose of wantonly, maliciously, or sadistically inflicting unnecessary pain or harm.

Robinson has submitted no credible evidence to rebut the defendant's showing that only the minimum amount of force necessary was used to apprehend and arrest him. In short, there is nothing to show that the Deputy Brown's conduct relating to the Robinson's arrest violated his clearly established statutory or constitutional rights of which a reasonable person would have known.

Finally, The Court does not find that Mr. Robinson was subjected to any mistreatment or use of excessive force post arrest. Therefore, application of the standard governing such claims pursuant to the Fourteenth Amendment to the U.S. Constitution is not necessary. See, *Graham v. Connor, supra.;* and *Vineyard v. County of Murray, Georgia,* 990 F.2d 1207 (11th Cir.1993); *Cottrell v. Caldwell,* 85 F.3d 1480 (11th Cir.1996); *Brothers v.. Klevenhagen,* 28 F.3d 452 (5th Cir.1994); and *Valencia v. Wiggins,* 981 F.2d 1440 (5th Cir.1993).

WHEREFORE, it is ORDERED:

1. Judgment is hereby entered in favor of Defendant Craig Brown and against Plaintiff Ron E. Robinson.

2. Plaintiff Robinson shall go hence forth without delay and the cause is dismissed with prejudice.

3. The Court reserves jurisdiction for any post trial motions which shall be filed within the time frame set forth in the Federal Rules of Civil Procedure.

4. This case is closed.