IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

————————————

No. 12-41223

————————————

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2014

Lyle W. Cayce
Clerk

CLAUDIA DAWSON,

      Plaintiff - Appellant

v.

ANDERSON COUNTY, TEXAS; SHERIFF GREG TAYLOR; JAILER
KAREN GILES; JAILER CHENEYA FARMER; JAILER SARAH WATSON;
JAIL SERGEANT DARRYL WATSON,

      Defendants - Appellees

————————————————

Appeal from the United States District Court
for the Eastern District of Texas

————————————————

ON PETITION FOR REHEARING AND REHEARING EN BANC
(Opinion May 6, 2014, 566 F. App'x 369)


Before SMITH, DENNIS, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

The Petition for Rehearing is DENIED. Judge Dennis dissents from the denial of panel rehearing for the reasons stated in his panel dissent of May 6, 2014, *Dawson v. Anderson County, Texas*, 566 F. App'x 369, 371–79 (5th Cir. 2014) (Dennis, J., dissenting), and the dissent from the court's denial of

rehearing en banc.

The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5TH Cir. R. 35), the Petition for Rehearing En Banc is also DENIED.

In the en banc poll, five judges voted in favor of rehearing (Judges Jolly, Dennis, Elrod, Haynes, and Graves) and ten judges voted against rehearing (Chief Judge Stewart and Judges Davis, Jones, Smith, Clement, Prado, Owen, Southwick, Higginson, and Costa).

ENTERED FOR THE COURT:

UNITED STATES CIRCUIT JUDGE

HAYNES, Circuit Judge, joined by DENNIS and GRAVES, Circuit Judges, dissenting from Denial of Rehearing En Banc:[1]

Police officers put their lives on the line every day to keep us safe, and I am grateful for the fact that we have men and women willing to serve for relatively low pay in these essential positions. The doctrine of qualified immunity recognizes that split-second decisions made in (literally) life and death situations should not be second-guessed by judges or juries far removed from the scene. However, immunity for officers is *qualified*, not absolute. The fact that Section 1983 liability exists in the first place recognizes that when a person is given a badge and a gun, the potential for abuse of power exists. The doctrine of qualified immunity is not meant to protect officers who behave abusively. *Cf. Ramirez v. Martinez*, 716 F.3d 369, 373, 378–79 (5th Cir. 2013) (upholding denial of summary judgment where officer tased suspect after he had been handcuffed and subdued).

Appellant Claudia Dawson accused several jail officers of using excessive force by issuing unreasonable orders for sport and shooting her with a pepperball gun when she refused to comply. The panel majority opinion found the jailers entitled to qualified immunity based on its conclusion that law officers may use "measured force" against an arrestee who refuses immediately successive search orders. *Dawson*, 566 F. App'x at 370–71 (majority opinion). Because there are genuine issues of fact as to whether the force was objectively reasonable, I conclude that the majority opinion erred in affirming the district court's opinion.

---

[1] Judge Dennis joins this dissent for the reasons set forth herein and for the reasons set forth in his dissent from the panel opinion. *Dawson v. Anderson Cnty.*, 566 F. App'x 369, 371–79 (5th Cir. 2013) (Dennis, J., dissenting).

The Supreme Court's recent decision in *Tolan v. Cotton* reminds us that, for summary judgment motions based on qualified immunity, the facts must be viewed in context and in the light most favorable to the nonmovant. 134 S. Ct. 1861, 1866 (2014). After Dawson was arrested and brought to the jail, she was asked to "squat and cough" while undressed in the presence of four armed jailers. The stated reason for the "squat and cough" was that the jailers needed to determine whether Dawson had secreted contraband or weapons on her person. Dawson testified that she complied with the initial command to "squat and cough." Anderson County contends she did not comply at all. The jailers asked Dawson to "squat and cough" again, allegedly stating that they would make her "squat and cough" "all night long." Dawson refused. At some point, the jailers responded by shooting her with a pepperball gun to force compliance.

As we must view the facts in the light most favorable to Dawson, we must assume she did comply with the initial command. Assuming Dawson complied, a jury could infer that the jailers were not concerned about safety at all but rather were issuing unreasonable orders for sport. *See Tolan*, 134 S. Ct. at 1867–68 (vacating grant of summary judgment where "a jury could reasonably infer that [the plaintiff's] words, in context, did not amount to a statement of intent to inflict harm"). In that light, it would be unreasonable for a jailer to take Dawson's refusal to comply for the jailer's amusement a second time (after already squatting and coughing), without more, as license to begin shooting pepperballs at her. No case law suggests this sort of procedure can be conducted for any reason other than to assure officers there is nothing hidden inside the cavity. As such, summary judgment was improper.

I recognize, however, that the fact that a case is wrongly decided on the merits is not, by itself, a basis for en banc rehearing. FED. R. APP. P. 35(a).

4

This case presents larger questions that would benefit from en banc consideration. Where is the line between a legitimate security protocol and government oppression? What standard should apply when the alleged victim of police abuse has been arrested but is not yet processed for pretrial detainment? Both questions are worthy of this full court's attention. I therefore dissent from the court's decision not to rehear this case en banc.

I agree that Supreme Court precedent makes a strip search with a "squat and cough" arguably permissible for an initial search. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510 (2012). But does *Florence* mean an officer can make a naked, defenseless arrestee "squat and cough" "all night long?" Once an arrestee "squats and coughs," how many more times must she comply? Is an arrestee required to follow any order from a group of armed jailers, regardless of how ridiculous, or face a pepperball to force compliance? Where is the line? Dawson argues that since she complied once, and no officer indicated a problem with the first "squat and cough," requiring her to "squat and cough" "all night long" just to humiliate her is not a legitimate basis upon which to use force, such as a pepperball shot, to obtain compliance. I submit that we cannot and should not tolerate unnecessary harassment and humiliation of arrestees for the amusement of officers.

Further, we lack clarity as to which standard should apply to determine whether the use of force was excessive in this case. When a plaintiff alleges that a government official has employed "excessive force" in violation of the Constitution, several constitutional standards are potentially applicable (the Fourth, Eighth, and Fourteenth Amendments). Whether a particular standard applies turns on the plaintiff's status during the relevant time period.

At one end of the timing spectrum are excessive force claims arising during the initial arrest or apprehension of a free citizen, which are governed by the Fourth Amendment. As explained by the Supreme Court in *Graham v. Connor*, when an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." 490 U.S. 386, 394 (1989) (quoting U.S. CONST. AMEND. IV). Analysis of a Fourth Amendment excessive force claim involves consideration of the need for force and the so-called *Graham* factors: the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

At the other end of the spectrum are excessive force claims arising during incarceration, after criminal prosecution is complete. A convicted inmate's excessive force claim is governed by the Eighth Amendment. As explained by the Supreme Court in *Hudson v. McMillian*, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. 1, 6–7 (1992). Analysis of an excessive force claim under the Eighth Amendment includes consideration of the *Hudson* factors: "[1] the extent of the injury suffered; [2] the need for the application of force; [3] the relationship between the need and the amount of force used; [4] the threat reasonably perceived by the responsible officials; and [5] any efforts made to temper the severity of a forceful response." *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)

(citation and internal quotation marks omitted). In contrast to the Fourth Amendment excessive force inquiry under *Graham*, which prohibits consideration of the officer's subjective intent, "[t]he focus of [the Eighth Amendment excessive force inquiry under *Hudson*] is on the detention facility official's subjective intent to punish." *Valencia v. Wiggins*, 981 F.2d 1440, 1449 (5th Cir. 1993).

Between these two periods, *i.e.*, between the time a suspect is initially arrested and then is incarcerated after being prosecuted, is pretrial detainment. The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from excessive force. *See Graham*, 490 U.S. at 395 n.10; *Brothers v. Klevenhagen*, 28 F.3d 452, 455–56 (5th Cir. 1994) ("A pretrial detainee receives the protection of the Due Process Clause of the Fourteenth Amendment."). Although the Due Process Clause of the Fourteenth Amendment protects pretrial detainees from excessive force, we have held that excessive force claims arising during a plaintiff's pretrial detainment are also governed by the Supreme Court's test from *Hudson*. *See Valencia*, 981 F.2d at 1446; *see also United States v. Daniels*, 281 F.3d 168, 179 (5th Cir. 2002) (explaining that "a claim of excessive force by a law enforcement officer is correctly examined under the same standard regardless whether the claim arises under the Eighth Amendment or the Fourteenth Amendment"). That is because "it is impractical to draw a line between convicted prisoners and pretrial detainees for the purpose of maintaining jail security." *See Valencia*, 981 F.2d at 1446. Thus, "when a court is called upon to examine the amount of force used on a pretrial detainee[] for the purpose of institutional security, the appropriate analysis is that announced in . . . *Hudson*." *Id.*

Less clear is the person who, like Dawson, has been arrested but not yet processed for pretrial detainment. We should take this case en banc to

announce clearly which of these standards applies to such a person. For its part, the majority opinion does not announce or follow any standard whatsoever. It rests, instead, on the seemingly unassailable notion that law enforcement officers are entitled to use force to obtain compliance with necessary commands. *See Dawson*, 566 F. App'x at 370–71. The problem here is that this analysis overlooks a significant factual dispute between the officers, who contend that Dawson did not comply at all (thus, she refused a "necessary command"), and Dawson, who contends that she did comply and that the further commands to "squat and cough" "all night long" were issued merely for sport. Three aspects of the evidence support Dawson's position: (1) the testimony of jailer Darryl Watson,[2] who agreed that one "squat and cough" is all that is necessary for security purposes such that subsequent "squat and coughs" would be "wrong," s*ee Los Angeles Cnty. v. Rettele*, 550 U.S. 609, 615 (2007) (deputies were not "free to force [plaintiffs] to remain motionless and standing for any longer than necessary"); (2) the fact that, taking Dawson's evidence as true, there was no security threat; and (3) the "totality of the circumstances," including statements allegedly made by the jailers, suggest the commands to Dawson were for sport, not security.

The true import of applying the correct standard becomes clear when considering the latter point. The *Hudson* test considers the subjective intent of the jailers. *Valencia*, 981 F.2d at 1449. Dawson alleged that the jailers laughed at her and were verbally abusive throughout the strip search. In this regard, the majority opinion misapprehended the import of the laughing and harassing. The majority opinion stated that verbal abuse by a jailer does not

---

[2] Watson testified: "Q: Now, if she did squat and cough one time when she was told to . . . then that would have been in compliance . . . ? A: Yes, sir. Q: And it would be wrong to have her get down and squat again? A: Yes, sir."

8

give rise to a Section 1983 claim. *See Dawson*, 566 F. App'x at 371. While I agree that verbal abuse, alone, is not actionable, the alleged statements inform the question of whether or not the commands were legitimate or for harassment and, in turn, whether force was justified to obtain compliance. In examining the "totality of the circumstances" and whether the commands were consistent with a need for security or simply done for sport, the alleged contemporaneous comments support a conclusion that it was the latter, not the former.

The facts as alleged by Dawson—which must be taken as true at this stage (even if ultimately a jury concluded they were greatly exaggerated)—suggest a level of sadism and brutality that is totally unacceptable. The majority vote of this court not to take this case en banc should not be viewed as condoning the conduct alleged here. It is not even necessarily an endorsement of the panel majority opinion. Judges vote against a grant of en banc rehearing for a variety of reasons that can include a conclusion that the particular issue is not squarely presented by the facts of the particular case. Nonetheless, this case raises serious questions that deserve clarity from this court. I therefore respectfully dissent from the court's decision to deny rehearing en banc.