**NEXTEL COMMUNICATIONS OF THE MID–ATLANTIC, INC., Plaintiff,**

**v.**

**MANCHESTER–BY–THE–SEA, Massachusetts, Defendant.**

**C.A. No. 00–10102.**

United States District Court, D. Massachusetts.

Aug. 23, 2000.

Steven E. Grill, Devine, Millimet & Branch, Manchester, NH, for Plaintiff.

Barbara J. Saint Andre, Illana M. Quirk, Kopelman and Paige, P.C., Town Counsel, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

This memorandum is based upon the transcript of the decision rendered orally on August 16, 2000, allowing the plaintiff's motion for summary judgment. This memorandum adds citations, deletes some colloquy, and clarifies some language.

\*   \*   \*   \*   .   \*   \*   •

## I.  SUMMARY

The plaintiff, Nextel Communications of the Mid–Atlantic, Inc. ("Nextel"), has sued Manchester–By–The–Sea ("Manchester") for violations of the Telecommunications Act of 1996 (the "TCA" or the "Act"). The Act, among other things, requires that the court hear and decide the case on an expedited basis. *See* 47 U.S.C. § 332(c)(7)(B)(v). The court has done so.

Nextel alleges that the Manchester Planning Board violated provisions of the

Act by refusing to grant a special permit for the construction of a telecommunications tower in a boatyard in Manchester Harbor. Among other things, Nextel asserts that Manchester violated 47 U.S.C. § 332(c)(7)(B)(iii) because the Planning Board's decision to deny Nextel's application for a special permit was not based on substantial evidence in the record.

■ The substantial evidence question is ordinarily resolved on the record before the court and no trial is required. *See Town of Amherst v. Omnipoint Communications*, 173 F.3d 9, 16 n. 7 (1st Cir.1999). The parties have agreed that it is appropriate to resolve this issue on the basis of the administrative record that was before the Planning Board. *See* Transcript of August 16, 2000 Hearing ("Tr.") at 2–3.

For the reasons explained below, the court concludes that the Manchester Planning Board's decision to deny Nextel's special permit was not supported by substantial evidence. Therefore, Nextel's motion for summary judgment is being allowed with regard to Count One of its Complaint. As a result, Manchester is being ordered to issue the permits necessary for the construction of an 80–foot tower that is 24 inches in diameter from top to bottom, as previously authorized by the Manchester Zoning Board of Appeals.

## II. ANALYSIS

In TCA cases alleging violations of 47 U.S.C. § 332(c)(7)(B)(iii), the Court of Appeals for the First Circuit has instructed that it is appropriate to employ the substantial evidence standard that it recently described in *Penobscot Air Services v. Federal Aviation Administration*. *See Town of Amherst*, 173 F.3d at 16 (citing *Penobscot Air Services v. Federal Aviation Administration*, 164 F.3d 713, 718 (1st Cir.1999)). In *Penobscot Air Services* the First Circuit wrote:

[S]ubstantial evidence review is conducted on the record considered as a whole. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

The reviewing court must take into account contradictory evidence in the record. But the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

In *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998), the Court equated the substantial evidence standard with whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion. The substantial evidence test gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that could satisfy a reasonable factfinder. This is an objective test, so, for example when the agency purports to be engaged in simple factfinding, ... it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands. The agency's findings must ... be set aside when the record before a Court ... clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Penobscot Air Services*, 164 F.3d at 718 (additional citations and internal quotation marks omitted).

The Court of Appeals for the Second Circuit has also emphasized the importance of looking at the record in its entirety. *See Cellular Telephone Company v. Town of Oyster Bay*, 166 F.3d 490, 494–95 (2nd Cir.1999).

■ Thus, the substantial evidence test requires, among other things, means that the court take into account evidence unfavorable to the agency's decision as well as the evidence that tends to support it. *See Town of Oyster Bay*, 166 F.3d at 494

("[T]he record should be viewed in its entirety, including evidence opposed to the Town's view."); *Omnipoint Corporation v. Zoning Hearing Board of Pine Grove Township*, 181 F.3d 403, 408 (3rd Cir.1999) ("[A] court views the record in its entirety and takes account of evidence unfavorable to the agency's decision."); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 744 (C.D.Ill.1997) ("[T]he Court must consider all evidence in the record, the evidence in favor of the decision under review, as well as the evidence opposed to the decision.").

The substantial evidence test is intended to reconcile the tensions between the competing aims of the TCA. As the Court of Appeals for the Third Circuit has described:

Congress enacted the Telecommunications Act to provide for a pro competitive, de-regulatory national policy framework designed to accelerate rapidly private-sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition.... Among the telecommunications technologies addressed was wireless telephone service. Congress found that siting and zoning decisions by non-federal units of government have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit the deployment of Personal Communications Services as well as the rebuilding of a digital technology-based cellular telecommunications network. But Congress also recognize[d] that there are legitimate State and local concerns involved in regulating the siting of such facilities ..., such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way. The House version of the Act would have required the FCC to regulate the siting of wireless telephone transmitters, but the Conference Committee instead enacted § 332(c)(7) to preserve the authority of State and local governments over zoning and land use matters except in

... limited circumstances.... As the First Circuit noted, section 332(c)(7) is a deliberate compromise between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.

*Zoning Hearing Board of Pine Grove Township*, 181 F.3d at 406–7 (additional citations and internal quotation marks omitted).

■ The TCA has generated a great deal of litigation. In many of those cases it has been held that the generalized concerns of the small number of people about the aesthetic and visual impact of a proposed tower does not constitute the substantial evidence required to deny a request for a permit, particularly where experts or other administrative bodies have expressed a contrary view. *See, e.g., Omnipoint Corporation v. Zoning Hearing Board of Pine Grove Township*, 20 F.Supp.2d 875, 880 (E.D.Pa.1998) (only twelve residents expressed complaints through one spokesman) *affirmed*, 181 F.3d at 409; *Town of Oyster Bay*, 166 F.3d at 496 (" [a] few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which the town could base the denials."); *Telecorp Realty v. Town of Edgartown*, 81 F.Supp.2d 257, 260 (D.Mass.2000) (Tauro, J.) (the "generalized concerns" of "a few residents" about the aesthetic impact of a proposed tower does not amount to substantial evidence); *Telespectrum v. Public Service Commission of Kentucky*, 43 F.Supp.2d 755, 758 (E.D.Ky.1999) (aesthetic concern of a single resident is not substantial evidence); *BellSouth Mobility v. Gwinnett County*, 944 F.Supp. 923, 926, 928 (absent objections from other boards that considered the issue, aesthetic concerns expressed by one person who spoke for all the members of his subdivision, including twenty property owners who could see the proposed pole from their front window, is not substantial evidence).

The court finds that this is another such case. In this case the Manchester Planning Board relied only on a relatively few number of statements of generalized concern about aesthetics in denying the requested permit. *See* November 2, 1999 Planning Board Minutes ("November 2 Minutes"), Record of Proceedings before the Manchester–By–The–Sea Planning Board ("R.") at 70–79; December 7 Minutes, R. at 127–129. Those concerns had not been expressed by the two agencies which addressed the matter before the Manchester Planning Board acted. *See* December 1, 1999 Decision of Manchester Zoning Board of Appeals, R. at 122; October 14, 1999 Letter of the Massachusetts Historical Commission, R. at 53. The Manchester Planning Board had the views of those agencies in the record before it. Thus, there was not substantial evidence to support the Manchester Planning Board's decision.

More specifically, the relevant record includes the following. Nextel provides wireless telecommunications services. *See* November 2 Minutes, R. at 71. Nextel believes there are imperfections in its ability to provide services in the Manchester area. *Id.* at 68–70. The parties disagree on the extent of the problem, but that dispute is not relevant to the motion for summary judgment with regard to Count One.

Nextel proposes to erect an 80–foot tower designed to look like a ship's mast or a flagpole in a boatyard in Manchester harbor. *See* Nextel's Application for a Special Permit, R. at 12–13; October 12 Minutes, R. at 37–38. Four color photographs of the proposed design were in the record before the Manchester Planning Board. *See* Photographic Simulations, R. at 30–33. Reproductions of those photographs are attached to this Memorandum Order as Exhibits A, B, C and D.

The Manchester Zoning Board of Appeals was asked for a variance to permit the erection of the proposed tower. *See* Nextel's Application for a Variance, R. at 8–11. The Zoning Board of Appeals granted the variance, and in rendering its decision, made the following findings:

Mr. McAuliffe [the attorney for Nextel] represented to the Board that the Application meets the hardship requirement for a Variance in that the Nextel network will not be able to provide appropriate service without obtaining a Variance. There will be no detriment to the public caused by allowing this pole to be erected. The structures are safe and in keeping with the expanding services to the community. The flagpole design is intended to be in keeping with the nautical character of the area and will visually blend into the surrounding environment of sail masts. Nextel plans to be responsible for keeping nautical flags on the pole and will replace them when necessary. The pole is an even cylinder in shape measuring twenty-four (24) inches from top to bottom. Nextel's plans are to provide in-building coverage in the Manchester area. The Facility will include coverage to downtown Manchester including in-building coverage and also to the residential area along Route 127. Although parts of Manchester receive adequate coverage, the west side of Manchester suffers from degraded signals and this results in dropped calls and customer complaints. The Board reviewed photographs that were distributed, exhibiting the mast-like appearance of the pole, flags appended, in order to blend in with the sailing masts on nearby boats. Similar poles have been erected in Marblehead, Ipswich and Essex. The Nextel representative noted that while there is another tower as well as a set of AT & T antennas in Manchester, there is no space available on any of the existing facilities in Manchester for Nextel. Topography of the land further along Route 127 towards Beverly Farms prohibits the possibility of another site and would also prevent coverage to Manchester's downtown area. In the event that Nextel discontinues service in the area and no longer needs the pole, the law requires that the

company is responsible for removing the pole with its Facility and to do so under a posted surety bond. No neighbors or abutters were present to speak for or against the project.

Based upon the foregoing, the Board finds that a literal enforcement of the provisions of the Zoning By–Law would involve substantial hardship, financial and otherwise, and prohibit the provision of personal wireless service facilities and that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intended purpose of the Zoning By–Law.

A motion was made to grant a Variance from the provisions of Section 5.5 of the Zoning By–Law to height restrictions in order to erect an 80–foot flagpole type antenna structure with a yard arm, subject to the following condition: The flagpole antenna structure is an even cylinder shape that will measure 24 inches from top to bottom and will be located at 17 Ashland Avenue on the easterly side of the Manchester Marine metal boat shed as generally described in the Nextel plans with the Application on file with the Board.[1]

December 1, 1999 Decision of Manchester Zoning Board of Appeals, R. at 122. This decision was in the record before the Manchester Planning Board at the time it decided to deny the requested permit. *Id.* at 121–123.

In addition to the decision of the Manchester Zoning Board of Appeals, the Massachusetts Historical Commission submitted a relevant letter that was also a part of the record before the Manchester Planning Board. *See* October 14, 1999 Letter of the Massachusetts Historical Commission, R. at 53. The site in question was part of the Manchester Village National Register Historic District, which is listed in the State and National Registers of Historic Places, and is within the proximity of the Man-

chester Historic District, a local historic district listed in the State Register of Historic Places. *Id.* Therefore, a review by the Massachusetts Historical Commission was legally required. *See* 950 C.M.R. § 71.07(2). That review was conducted. *See* October 14, 1999 Letter of the Massachusetts Historical Commission, R. at 53.

The Massachusetts Historical Commission submitted a letter to the Manchester Planning Board on October 14, 1999. *Id.* It states, in pertinent part, that:

[T]he Commission understands that the proposed project will involve the construction of an 80–foot monopole stealthed as a flagpole and the construction of an associated equipment shelter at its base. The MHC has reviewed the photo simulation Nextel submitted, which indicates that the stealth pole will be designed to blend in with the ships' masts in the marina. After a review of Commission files and materials submitted, I [the Executive Director], have determined that the proposed project will have no adverse effect on the Manchester Village National Register Historic District and the Manchester Historic District.

*Id.*

In reaching this conclusion, the Executive Director, on behalf of the Massachusetts Historical Commission, cited 36 C.F.R. § 800.5(b), and also 950 C.M.R. § 71.07(2)(B)(2). *Id.* Section 800.5 establishes criteria for determining whether proposed construction will have an adverse effect on the historic and cultural value of a property listed on the National Register. *See* 36 C.F.R. § 800.5(a)(1). It states as one example of such adverse effects on historic properties the "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features ...". 36 C.F.R. § 800.5(a)(2)(v). Thus, in determining that the proposed construction of

---

1. This decision was rendered on December 1, 1999. It is the same in all material respects as the decision that had been rendered earlier

with regard to a smaller tower. *See* October 4, 1999 Decision of the Zoning Board of Appeals, R. at 24–26.

Nextel's tower would have no adverse effect, the Massachusetts Historical Commission considered its visual impact.

In addition, the Manchester Department of Public Works furnished a letter to the Manchester Planning Board expressing no position on the proposed project. *See* September 13, 1999 Letter of the Manchester–By–The–Sea Department of Public Works, R. at 20.

Nextel requested from the Manchester Planning Board a legally required special permit to build its tower in the harbor. *See* Special Permit Application, R. at 12–19. The proposed tower is an 80–foot cylinder that is 24 inches in diameter. *See* November 2 Minutes, R. at 66–67; December 1, 1999 Decision of Manchester Zoning Board of Appeals, R. at 122. Nextel reiterated to the Manchester Planning Board that there were no other feasible sites, but this fact is not material to the instant issue. *See* October 12 Minutes, R. at 38. Nextel submitted to the Planning Board the photographic simulations that it had previously presented to the Zoning Board of Appeals and the Massachusetts Historical Commission. *See* Photographic Simulations, R. at 30–33.

The Planning Board held public hearings on October 12, November 2, and December 7, 1999. *See* Minutes of Planning Board Hearings, R. at 36–50, 58–83, 125–129. During the October 12, 1999 hearing, Nextel's representative stated that the proposed structure would conceal the actual telecommunications antenna from view by housing the antenna inside the tower. *See* October 12 Minutes, R. at 38, 39. He added that although the proposed tower would reach 80 feet in height, the tallest ships moored at the boatyard had masts reaching 75 feet in height. *Id.* Nextel also presented the Planning Board with documentary evidence, including the photographic simulations, in an attempt to demonstrate that the visual impact of the antenna structure on the surrounding area would be minimized because the tower was designed to appear like a nautical mast or large flagpole. *See* Photographic

Simulations, R. at 30–33. Nextel also submitted the letter from the Manchester Department of Public Works stating that it took no position with regard to Nextel's proposed project. *See* September 13, 1999 Letter of the Manchester–By–The–Sea Department of Public Works, R. at 20. The Planning Board voted to continue the October 12, 1999 hearing. *See* October 12 Minutes, R. at 39A.

The Planning Board hearing resumed on November 2, 1999. *See* November 12 Minutes, R. 58. At that hearing Nextel addressed concerns presented by § 4.10.3(1) of Manchester By–Laws. *Id.* at 64–65. That provision relates to limiting the potential visual impact on neighboring properties. *See* § 4.10.3(1) of the Manchester By–Laws. Nextel's representatives stated that it had attempted to comply with the criteria of that provision by designing the tower to be consistent in appearance with the nautical theme of the harbor. *See* November 12 Minutes, R. at 64–65. Nextel's representative asserted that the proposed tower was not overbuilt; rather, it was designed to provide the bare minimum coverage necessary to cover downtown Manchester and Route 127. *Id.* at 65.

With regard to § 7.5.2(d) of the Manchester By–Laws, which relates to the proposed project's likely impact on visual vistas in the neighborhood, Nextel's representative stated that the proposed design reflected Nextel's effort to balance the aesthetic character of the harbor with its need to improve its coverage. *See* November 2 Minutes, R. at 67. He also pointed out that the proposed structure would be able to house two additional telecommunications antennas, thus limiting the need for other telecommunications providers to erect additional structures in Manchester because their antennas could be co-located within Nextel's tower. *Id.* at 68.

During the November 2, 1999 hearing, members of the Planning Board expressed their opinions that the design of the tower was insufficient from an aesthetic perspec-

tive. *Id.* at 70–79. Mr. Foster, a Planning Board member, commented that the tower looked more like a chimney than a mast. *Id.* Mr. Brown, another Planning Board member, stated that Manchester does not want an 80–foot tower in its harbor. *Id.* One citizen, Jeremiah Noonan, also spoke against the tower's placement in the harbor on aesthetic grounds. *Id.* at 76. Ms. Hill, another Planning Board member, read into the record a telephone message from Bob Reed, a Manchester resident, in which he stated his opposition to the proposed tower. *Id.* at 79. Another Planning Board member, Mr. Kennely, read into the record three letters from local residents stating their opposition to the tower. *Id.*

Mr. Kennely also read into the record a petition in opposition to the tower from eleven neighbors, residents of Ashland Avenue. *Id.* The handwritten petition stated in one sentence: "No Nextel Tower at 17 Ashland Ave., Manchester Oct. 1999." Petition, R. at 34. This sentence was followed by eleven signatures. *Id.* The petition did not state the reasons for the petitioners' opposition to the tower. *Id.*

The Manchester Planning Board held another hearing on December 7, 1999. *See* December 7 Minutes, R. at 125–129. Nextel's representative reported to the Planning Board that Nextel had looked into the possibility of building a tower on Powder House Hill, as suggested by the Planning Board, but had come to the conclusion that it was not feasible to do so. *Id.* at 127. Again, the feasibility of an alternative site is not material to the merits of the motion for summary judgment on Count One of Nextel's Complaint.

During the December 7, 1999 hearing, one resident and several members of the Planning Board spoke against the proposed tower. *See* December 7 Minutes, R. at 127–129. Planning Board member Brown again stated that people in town do not want an 80–foot tower in their harbor and that Manchester has made efforts over the years to leave the harbor just the way it is. *Id.* at 127. Mr. Vance, another Planning Board member, stated that the negative impact on visual vistas is one of the factors Nextel was supposed to have mitigated and that in his opinion the proposed tower looked like an 80–foot smokestack. *Id.* Planning Board member Foster, stated that the tower would have a significant and negative aesthetic impact on the town and would be visible from several areas of it. *Id.* He also stated that the tower would not look like a mast. *Id.*

Planning Board member Hill, stated that the proposed tower would result in property devaluation for the abutting residents and that he felt that Nextel's application should be rejected for aesthetic reasons. *Id.* One resident, Dick Slater, stated that the tower would be an eye-sore and that he did not want it located in the harbor. *Id.*

Throughout the three hearings, no photographic evidence, property appraisals or other evidence was submitted in support of the opinions of the Planning Board and the protesting residents. *See* Minutes of Planning Board Hearings, R. at 36–50, 58–83, 125–129.

On December 21, 1999, the Planning Board issued its written decision denying Nextel's application for a special permit. *See* December 21, 1999 Decision of the Planning Board, R. at 152–155. The Planning Board stated that the application:

> [D]oes not satisfy the requirements of all of Section 4.10 of the Zoning By–Law in general and in particular Sections 4.10.3(1); and that in addition it does not satisfy Section 7.5.2 of the Zoning By–Law with regard in particular to the statement that No special permit shall be granted unless the special permit granting authority determines that the proposed use will not be detrimental to the surrounding neighborhood in light of each of the following factors: (a) Adequacy of the site; (b) Suitability of the Site, and (d) Impact on the neighborhood visual character including views and vistas.

*Id.* at 155.

As counsel for Manchester acknowledged during the August 16, 2000 hearing

before this court, all of the grounds for the rejection of the request for a special permit were, in essence, aesthetic grounds. *See* Tr. at 9–10. The Manchester Planning Board cited § 4.10.3(1) of the Manchester By–Laws, requiring mitigation "against potential negative impacts on visual quality upon neighboring properties by incorporating reasonable design, siting and screening methods." *Id.* The portions of § 7.5 of the Manchester By–Laws cited by the Manchester Planning Board state, in pertinent part, that the proposed use must not be detrimental to the surrounding neighborhood in light of each of the following factors:

(a) Adequacy of the site in terms of size for the proposed use;

(b) Suitability of the site for the proposed use;

(d) Impact on neighborhood visual character, including views and vistas ...

Section 7.5.2 (a-b, d) of the Manchester By–Laws.

As described earlier, the fundamental question presented by the motion for summary judgment is whether the Manchester Planning Board had substantial evidence to support its decision. In essence, the evidence before the Planning Board was that eleven residents objected based on aesthetics, either orally, in letters, or in telephone messages to the Planning Board. *See* November 2 Minutes, R. at 76–79; December 7 Minutes, R. at 127. In addition, eleven people signed a one-line petition giving no reason for their objection to the proposed tower. *See* Petition, R. at 34.

The members of the Planning Board expressed the opinions recited earlier. *See* November 2 Minutes, R. at 70–76; December 7 Minutes, R. at 127–129. The Planning Board received no expert evidence with regard to aesthetics or possible injury to property values. *See* Minutes of Planning Board Hearings, R. at 36–50, 58–83, 125–129.

The record does include, however, the findings of the Manchester Zoning Board of Appeals that there would be no detriment to the public if the tower is built, and

that its design is in keeping with the nautical character of the area and will visually blend into the surrounding area of sail masts. *See* December 1, 1999 Decision of Manchester Zoning Board of Appeals, R. at 122. The record also includes the Massachusetts Historical Commission's finding that there would be no adverse effect on historic district if the tower were built, a conclusion rendered after consideration of the effect that the tower would have on the visual integrity of the harbor. *See* October 14, 1999 Letter of the Massachusetts Historical Commission, R. at 53 (citing 36 C.F.R. § 800.5(b) and 950 C.M.R. § 71.07(2)(B)(2)).

The court finds that this case is comparable to the many cases in which generalized concerns about aesthetics were not deemed sufficiently substantial evidence to justify the refusal to grant a permit. *See, e.g.,* Zoning Hearing Board of Pine Grove Township, 20 F.Supp.2d at 880, *affirmed,* 181 F.3d at 409; *Town of Oyster Bay,* 166 F.3d at 496; *Town of Edgartown,* 81 F.Supp.2d at 260; *Public Service Commission of Kentucky,* 43 F.Supp.2d at 758; *Gwinnett County,* 944 F.Supp. at 926, 928.

There are two cases decided by the Court of Appeals for the Fourth Circuit on which the defendant particularly relies that deserve some analysis. *See AT & T Wireless PCS v. Winston–Salem Zoning Board of Adjustment,* 172 F.3d 307 (4th Cir.1999); *AT & T Wireless PCS v. City Council of Virginia Beach,* 155 F.3d 423 (1998). The court finds that these cases are either factually distinguishable or unpersuasive.

In *City Council of City of Virginia Beach,* the Court of Appeals for the Fourth Circuit treated the City Council as a legislative body rather than an administrative body. *See* 155 F.3d at 430 ("The 'reasonable mind' of a legislator is not necessarily the same as the 'reasonable mind' of a bureaucrat, and one should keep the distinction in mind when attempting to impose the 'substantial evidence' standard onto the world of legislative decisions.").

Like the Court of Appeals for the Third Circuit in *Zoning Hearing Board of Pine Grove Township,* this court finds this distinction to be doubtful for TCA purposes. *See* 181 F.3d at 408–9.

In any event, in *City Council of Virginia Beach,* the objectors had very quickly gathered approximately 800 signatures in opposition to the proposed construction. *See* 155 F.3d at 425. The court recognizes that Manchester is probably a much smaller community than Virginia Beach, but counsel for Manchester commendably acknowledged during the August 16, 2000 hearing that the evidence in the instant case is not as strong as the evidence in the *Virginia Beach* case. *See* Tr. at 24–25; *see also* November 2 Minutes, R. at 70–79; December 7 Minutes, R. at 127–129 (eleven protestors and several Planning Board members objected to Nextel's proposed construction).

In *Winston–Salem Zoning Board of Adjustment,* among other things, there was evidence from several sources that construction of the proposed tower would injure the chance of getting an adjacent property placed on the National Register of Historic Sites. *See* 172 F.3d at 316. In the instant case there is no comparable evidence. To the contrary, the evidence in the record is that the historic character of the harbor will not be injured by the erection of Nextel's proposed tower. *See* October 14, 1999 Letter of the Massachusetts Historical Commission, R. at 53.

Cases arising under the TCA are difficult because they involve the collision of competing, legitimate interests. As the Court of Appeals for the First Circuit has noted, "[t]he statute's balance of local autonomy subject to federal limitations does not offer a single 'cookie cutter' solution for diverse local situations, and it imposes an unusual burden on the courts." *Town of Amherst,* 173 F.3d at 17. Citizens historically have had considerable control over what could be erected in their communities and it is common for residents to feel strongly about proposed construction in their city or town. However, in enacting the TCA Congress and the President have expressed the view that it is in the public interest to limit the discretion that municipalities ordinarily have in order to facilitate the rapid progress of the telecommunications industry. *Id.* at 13. Even recognizing that a reasonable range of discretion remains and is protected by the substantial evidence standard of review, in this case Manchester did not have a legally proper basis to deny Nextel's application for a special permit. Thus, Nextel's motion for summary judgment is being allowed.

In addition, the court is ordering that the Manchester Planning Board issue Nextel the special permit required for the construction of its proposed tower. This has been deemed the appropriate remedy in the majority of meritorious TCA cases. *See Town of Oyster Bay,* 166 F.3d at 497 (citing cases). As other courts have observed, "simply remanding the matter to the [B]oard for their [further] determination would frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis." *Sprint Spectrum L.P. v. Town of Easton,* 982 F.Supp. 47, 52 (D.Mass.1997), (quoting *Gwinnett County,* 944 F.Supp. at 929).

## III.   ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. Nextel's motion for summary judgment (Docket No. 11) is ALLOWED with regard to Count One.

2. The defendant shall issue forthwith the special permit required to authorize Nextel to erect the proposed tower for which it received a variance from the Manchester Zoning Board of Appeals.