Jose O. GARCIA, Plaintiff,

v.

CITY OF BOSTON, Boston Emergency
Services Team, New England Medical
Medical Center Hospitals, Inc., and
John Doe, Defendants.

No. Civ.A. 97–12047–MEL.

United States District Court,
D. Massachusetts.

Sept. 15, 2000.

William E. Gately, Jr., Law Offices of William E. Gately, Braintree, MA, for Plaintiff.

John J. Cloherty, City of Boston Law Department, Nadine N. Donovan, Alan B. Rindler, Rindler & Morgan, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

LASKER, District Judge.

Jose O. Garcia sued the City of Boston alleging violations of his constitutional rights under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, M.G.L. ch. 12, § 11I. He then amended the complaint, adding claims against New England Medical Center and Boston Emergency Services Team (the "medical defendants") for negligence and breach of contract. Both the City and the medical defendants move for summary judgment dismissing the claims against them.

### I.

Garcia was arrested by the Boston Police Department (the "BPD") on Friday, August 19, 1994, following a domestic disturbance. He was arrested on charges of violating M.G.L. ch. 209A, assault and battery upon police officers in violation of M.G.L. ch. 265, § 13D, and on an outstanding default warrant. He was taken to the

Area B, District 2 police station, where he was booked and placed in a cell. Because it was Friday evening, he would not be arraigned until Monday morning.

That evening, at approximately 8:40 p.m., Garcia made an apparent attempt to commit suicide by cutting his left wrist with the aluminum top of a juice container that had been given to him with his dinner. An ambulance was summoned but Garcia refused treatment. He was placed on the suicide list at the station and handcuffed to the bar on the wall in the booking area where the officers on duty could closely monitor his activities.

The following evening, Garcia again attempted to commit suicide. At approximately 10:10 p.m., while still handcuffed to the wall in the booking area, Garcia got hold of a book of matches and set fire to his own clothing. He sustained burns to the right arm, chest and neck. He was taken by ambulance to Boston City Hospital ("BCH"), now known as Boston Medical Center, for medical treatment.

At BCH, Garcia was treated for first and second degree burns and was cleared from a medical standpoint. He was then evaluated by Dr. DeMello, a resident psychiatrist, to determine appropriate placement and disposition. At that time, Garcia expressed suicidal thoughts, including that if he had a gun he would "blow [his] brains off," and that he "would do anything" to kill himself. Dr. DeMello concluded that Garcia was a suicide risk and filled out an Application for Temporary Hospitalization under M.G.L. c. 123, § 12, the paperwork required for an involuntary admission to the hospital. Since BCH was not equipped with inpatient psychiatric capability, Dr. DeMello contacted Boston Emergency Services Team ("BEST") to locate an inpatient psychiatric facility which could care for Garcia.

BEST is the name (and nothing more than the name) of a program of the New England Medical Center's ("NEMC") Department of Psychiatry. BEST's stated mission is "[t]o provide timely, quantitative assessment and disposition for individuals in the Boston Area who require emergency psychiatric services."

A primary component of the BEST program is a centralized telephone referral and triage system utilizing an 800 number. The 800 number is operated by a staff of psychiatric clinicians who conduct preliminary quantitative assessments over the phone or dispatch Emergency Services Teams to conduct the assessment in person, if necessary. The 800 number is also available to Designated Emergency Rooms to search for bed availability once the emergency room staff determines that psychiatric placement is necessary. In August 1994, the Emergency Department at BCH was a Designated Emergency Room under the BEST program.

On August 21, 1994, the BEST representative who took Dr. DeMello's call was Adrienne Gallmeister, a licensed clinical social worker. It was determined that the sole inpatient treatment option for Garcia was a DMH facility because Garcia was uninsured and therefore ineligible for placement in a private facility. Accordingly, Ms. Gallmeister conferred with BEST Supervisor Linda Sahovey, a psychiatric clinical specialist, and DMH Adjudicator Jim Galvin about admitting Garcia to a DMH facility. Galvin, on behalf of DMH, took the position that because Garcia was under arrest, in police custody, and not yet arraigned, DMH could not accept Garcia as a psychiatric patient, but that DMH would accept him if he were arraigned or the charges against him were dropped.

Since no judge was available to arraign Garcia, the question of whether BPD would drop the charges against him was explored up the chain of command at the Boston Police Department, but was ultimately rejected because of the seriousness of the offenses charged. Moreover, Garcia was "non-bailable" because of the outstanding default warrant against him. Accordingly, the police department, proposed that Garcia remain at BCH under police guard until his arraignment the following morning. The BCH staff rejected this

suggestion on the grounds that BCH did not have inpatient psychiatric capabilities. Dr. Peter Moyer testified that BCH's decision was based also on a concern that Garcia might "shoot[ ] somebody in [the] Emergency Department."

The end result was that, on Sunday, August 21, 1994, Garcia was discharged from BCH into the custody of the BPD. At approximately 1:00 p.m., Garcia was transported back to the BPD station house and again handcuffed to the "suicide wall" in the booking area. Approximately fifteen minutes later, Garcia apparently lit his shirt on fire. The fire was extinguished without injury to Garcia. Because of this third suicide attempt, Garcia was kept handcuffed to the suicide wall and his clothes (with the exception of his undershorts) were removed.

Then, at approximately 1:45 p.m. that afternoon, Officer William Cullinane entered the booking area to distribute lunches to the prisoners on the suicide wall. While Officer Cullinane was attempting to hand Garcia his lunch, Garcia pulled Cullinane's gun out of its holster and shot Officer Cullinane and Powell Louis, another prisoner. Garcia was then shot by Officer Stephen Fahey. Garcia, Cullinane, and Powell were taken by ambulance to the hospital where they were treated for their injuries.

## II.

### A. *The Medical Defendants Motion for Summary Judgment*

BEST and NEMC move for summary judgment dismissing the complaint as to them. BEST contends that it cannot be sued because it is not a legal entity, but merely the name given to a program run by the NEMC under a contract between NEMC and DMH. BEST and NEMC also argue that the evidence in the record is insufficient to support the claims of negligence and breach of contract against them. They further assert that Garcia's negligence claim is meritless because Garcia's own unforeseeable intervening criminal act cut off any liability that might be attributed to their actions.

In response, Garcia does not directly dispute BEST's lack of capacity argument. Rather, he asserts that BEST waived the defense because Best failed to plead it. He further contends that he has been severely prejudiced by BEST's failure to plead incapacity until the filing of its motion for summary judgment, and, accordingly, requests that the Court deny BEST's motion or, in the alternative, permit him to amend the complaint to include the specific individuals who comprised the BEST team during the relevant time frame.[1] Garcia also maintains that the record is sufficient to establish genuine issues of material fact in connection with his negligence and breach of contract claims.

However, putting aside the arguments as to BEST's capacity to be sued and whether BEST waived this defense, the decisive question is whether the evidence of record is sufficient to warrant submission of Garcia's claims to a jury. Viewing the evidence in the light most favorable to Garcia and drawing all inferences in his favor, the negligence and contract claims against BEST and NEMC nevertheless cannot be sustained.

### 1. *Negligence*

Garcia's amended complaint advances two theories of negligence: (1) medical malpractice, and (2) administrative negligence. He alleges that NEMC and BEST were "careless and negligent with respect to [his] medical, psychiatric and psycho-

---

1. Garcia has since moved to amend the complaint to substitute ten individual defendants in place of BEST. As the discussion below makes clear, the claims against the medical defendants fail as a matter of law because they lack evidentiary support in the record.

Therefore, allowing Garcia to substitute individual defendants for BEST would be legally futile. Accordingly, the plaintiff's motion is denied. *See Judge v. City of Lowell,* 160 F.3d 67, 79 (1st Cir.1998).

therapeutic care, treatment, management and attendance," and that they "failed to admit [him] to a locked psychiatric facility or take appropriate steps to ensure that [he] did not inflict injury upon himself and/or third parties." He complains that, as a result of their negligence, he "suffer[ed] severe and permanent personal injuries . . . and will continue to sustain damages in the future."

### i) *Medical Malpractice*

■ To establish a claim for medical malpractice under Massachusetts law, a plaintiff must demonstrate the existence of a physician-patient relationship. *Doherty v. Hellman,* 406 Mass. 330, 333, 547 N.E.2d 931 (1989); *see also Mitchell v. United States,* 141 F.3d 8, 13 (1st Cir.1998) (discussing elements of medical malpractice suit under Massachusetts law). The acceptance or undertaking of treatment of a patient by a physician creates the relationship. *See Lambley v. Kameny,* 43 Mass.App.Ct. 277, 283–84, 682 N.E.2d 907 (1997). The question of the existence of the relationship is one of fact.

BEST and NEMC argue that there is no evidence that a provider-patient relationship existed at any time between NEMC or BEST and Garcia. They point out that the record is devoid of evidence that they evaluated, treated, or cared for Garcia. They add that their lack of involvement in Garcia's medical and psychiatric care is further evidenced by the fact that BEST was contacted by the BCH emergency department staff only after BCH physicians had treated Garcia for his physical injuries, evaluated his psychological state and determined that he needed emergency psychiatric placement.

Garcia answers that a factual dispute exists as to whether such a relationship existed. According to Garcia, the duties, responsibilities and obligations BEST and NEMC assumed in the DMH services contract (and related documents) not only establish that BEST and NEMC qualify as "healthcare providers," but directly refute their claim that they did not care, treat or evaluate Garcia. He asserts that the deposition testimony of Linda Sahovey, the BEST 30(b)(6) designee, that a person seen at BCH emergency room for psychiatric determination is a BEST "patient," is additional evidence of a provider-patient relationship. Garcia further claims that BEST's telephone triage record shows that the BEST operator, who answered Dr. DeMello's call to the 800 number, in fact, evaluated Garcia's psychiatric status and need for hospitalization using BEST's computer system.

■ A review of the record compels the conclusion that neither BEST nor NEMC stood in a provider-patient relationship with Garcia. There is no evidence that BEST or NEMC independently treated, evaluated or rendered care to him. Garcia's own expert report, while concluding that such a relationship existed between Garcia and BCH physicians, is notably silent with respect to BEST and NEMC. Moreover, the BEST telephone triage record merely reflects the information relayed to the BEST operator by the BCH psychiatrist, Dr. DeMello, who evaluated Garcia. In fact, the evidence establishes that BEST's and NEMC's involvement with Garcia occurred after Garcia had been treated and evaluated at BCH and only because the BCH emergency department staff determined that the appropriate disposition was placement in an inpatient psychiatric facility. *Cf. Doherty,* 406 Mass. at 334, 547 N.E.2d 931 (dismissing medical malpractice claim against physician who was consulted after the alleged negligent treatment).

Garcia has a fallback position. He argues that a provider-patient relationship was created by virtue of the services contract NEMC entered into with the DMH. As support, he relies upon BEST's stated mission to provide "quantitative assessment and disposition for individuals in the Boston Area who require emergency psychiatric services." Nevertheless, this statement cannot be construed automatically to establish a doctor-patient relationship with each individual in the Boston Area or even those individuals who come

into contact with the BEST program. *Cf. Haywood v. Rechen*, 45 Mass.App.Ct. 185, 191, 696 N.E.2d 549 (1998) (position as director of college health services did not make the defendant physician the personal physician of all of the college's students).

### ii) *Administrative Negligence.*

The medical defendants contend that the claim of administrative negligence fails because: (1) the sole inpatient option available at the time was a DMH facility; and (2) the decision not to place Garcia in a DMH facility was made by DMH, not BEST or NEMC.

Garcia responds that there is sufficient evidence for a jury to find that BEST and NEMC were negligent with respect to the management of his case. He contends that despite their obligation to provide emergency psychiatric services "to any individual experiencing a psychiatric emergency or crisis," BEST and NEMC "refused or otherwise failed to admit him to a locked psychiatric facility" after his second suicide attempt in 24 hours. He further asserts that the NEMC's services contract with DMH rebuts their claim that placement in a DMH facility was the sole treatment option available at the time.

 The record refutes Garcia's allegations. The only evidence as to BEST's role in the management of Garcia's case is that BEST was contacted by Dr. DeMello, a BCH physician, to locate a psychiatric bed for Garcia at a DMH facility. The BEST staff then checked with Jim Galvin, a DMH adjudicator, who was available to answer policy questions about the placement of patients in DMH facilities. The affidavits of Clifford Robinson, the DMH Regional Director for Metro Boston, and Linda Sahovey, the BEST Supervisor, establish that it was Galvin, on DMH's behalf, who declined to permit Garcia to be admitted at a DMH facility. According to Robinson and Sahovey, Galvin took the position that Garcia was ineligible for placement in a DMH facility because he was under arrest, in police custody, and

not yet arraigned, but that DMH would accept Garcia if the charges against him were dropped. The BPD, however, declined to drop the charges against Garcia because of the gravity of the offenses.

The evidence confirms that once the BPD refused to drop the charges and DMH declined to accept Garcia, BEST had no other inpatient options for Garcia. Garcia could not remain at BCH because BCH was not equipped to treat psychiatric patients on an inpatient basis. He was ineligible for placement with a private facility because he was uninsured. Bridgewater State Hospital, a state psychiatric hospital was not a viable alternative because admission to Bridgewater required a court order and BEST had no authority to obtain such an order.[2] In sum, there is no evidence that either BEST or NEMC was negligent in its administration of Garcia's case.

### iii) *Causation*

BEST and NEMC contend that they are further entitled to dismissal of Garcia's negligence claims because the failure to place Garcia in an inpatient psychiatric facility was not the direct and proximate cause of his injuries. They assert that Garcia's criminal act of shooting Officer Cullinane broke the chain of causation, and that no BEST or NEMC personnel could have anticipated that Garcia would not be properly secured or that he would obtain access to a police officer's issued firearm while in police custody.

Garcia counters that there is a factual issue as to the question of foreseeability. He argues that his conduct while in police custody, including his two suicide attempts in 24 hours, made it pretty clear that the BPD could not properly secure him. That BEST and NEMC should have anticipated his subsequent actions as "likely to happen" is further evidenced, according to Garcia, by the deposition testimony of Dr. Moyer, a BCH physician, in which he stated that the decision not to keep Garcia at BCH under police guard was based in part

---

**2.** The record indicates that these court orders were ordinarily obtained by the BPD.

on the concern that Garcia might "shoot[ ] somebody in [the] Emergency Department."

Although the medical defendants make a strong case that Garcia's subsequent criminal act of shooting Officer Cullinane was the superseding cause of Garcia's injuries, it is unnecessary to reach this issue. As discussed above, the evidence establishes that, at the time, the sole inpatient treatment option available to BEST was placement in a DMH facility. There is no evidence connecting either BEST or NEMC to the DMH's refusal to accept Garcia at a DMH facility. Accordingly, Garcia's negligence claims fail regardless of whether he can show that the failure to place him in an inpatient psychiatric facility was the direct and proximate cause of his injuries.

### 2. Breach of Contract

■ Garcia alleges that, under the services contract, BEST and NEMC had a duty to provide emergency psychiatric services and that their failure to place him in an inpatient facility or otherwise provide emergency psychiatric services amounted to a breach of their obligations under the contract.

As discussed above, the evidence establishes that the decision to decline Garcia admission was made by DMH and not by BEST or NEMC. Once DMH refused to accept Garcia and the police declined to drop the charges against him, BEST and NEMC had no alternative inpatient treat-

ment options. Nor is there any evidence that either BEST or NEMC had any further responsibilities as to placing Garcia. Therefore, because they satisfied their duties under the services contract, Garcia's contract claims cannot be maintained as a matter of law.[3]

\* \* \* \* \* \*

For these reasons, the motion for summary judgment dismissing the complaint as to BEST and NEMC is granted.

### B. The City of Boston's Motion for Summary Judgment

Garcia sues the City of Boston for violations of his federal and state constitutional rights. Although Garcia does not specifically refer to section 1983 or the Massachusetts Civil Rights Act (the "MCRA"), he alleges that the City deprived him of his rights to:

a. Freedom from the deprivation of liberty without due process of law;

b. Freedom from cruel and unusual punishment;

c. Denial of appropriate, necessary and reasonable medical and psychological care;

d. Freedom from the use of force.

Amended Complaint, ¶¶ 25 & 29. These allegations support claims for violations of two constitutionally protected rights: (1) the right not to be subjected to excessive and unreasonable force; and (2) the right to medical and psychological care while in police custody.[4]

---

3. The medical defendants submit two additional grounds for dismissing the contract claims. They contend that the claim against BEST fails as a matter of law because the only contract that existed at the time was the services contract between NEMC and DMH and BEST was not a party to that contract. They further assert that the claim against NEMC cannot be maintained because Garcia was merely an incidental, rather than an intended, beneficiary of the services contract, and therefore, NEMC owed no duty to Garcia. Because, as discussed above, Garcia's contract claims fail as a matter of law, it is not necessary to rule on these additional proposed defenses.

4. To the extent that Garcia alleges an Eighth Amendment claim for cruel and unusual punishment on the grounds that he was wrongfully denied medical assistance, the claim cannot be maintained. "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711. At the time Garcia required medical care he was a pre-trial detainee. Therefore, Garcia's right to medical care is grounded in the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

### 1. *42 U.S.C. § 1983*

#### i) *Excessive and Unreasonable Force*

The City moves for dismissal of Garcia's excessive force claim. It argues that the claim cannot be maintained because the firing of one round by Officer Fahey that struck Garcia in the left arm and caused him to drop his weapon was reasonable and necessary under the circumstances. Garcia answers that the fact that the City placed a service revolver within his reach despite three suicide attempts and therefore put him in a position where Officer Fahey would need to shoot him presents a material issue of fact as to whether the force used was excessive.

Because Garcia was a post-arrest, pretrial detainee, his excessive force allegations should be analyzed under the Fourteenth Amendment and not the Fourth Amendment. In *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that excessive force claims in the context of "an arrest, investigatory stop, or other 'seizure' of a free citizen" must be analyzed under the Fourth Amendment and its reasonableness standard, rather than under a substantive due process approach. The Court, however, left unresolved whether and to what extent the protections of the Fourth Amendment may extend to pretrial detainees, but acknowledged that the Due Process Clause of the Fourteenth Amendment protects a pretrial detainee from excessive force that amounts to punishment. *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865. (citing *Bell v. Wolfish*, 441 U.S. 520, 535–39, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Since *Graham*, the Courts of Appeals have continued to analyze excessive force claims brought by pretrial detainees under the Fourteenth Amendment's substantive due process approach. *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 796 (1st Cir.1990) ("We assume that claims of excessive force outside the context of a seizure still may be analyzed under substantive due process principles."); *Riley v. Dorton*, 115 F.3d 1159, 1166 (4th Cir.1997); *Dorsey v. St. Joseph County Jail Officials,* 98 F.3d 1527, 1528 (7th Cir.1996); *Valencia v. Wiggins,* 981 F.2d 1440, 1443–45 (5th Cir.1993).

In *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.1973), *rejected on other grounds by Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), Judge Friendly articulated a four part test for evaluating excessive force claims under the Fourteenth Amendment:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether the force was applied in good faith to maintain or restore discipline or maliciously and sadistically for the very purpose of inflicting harm.

481 F.2d at 1033.

■ Applying these factors in the present case, the evidence cannot support a finding that the use of force was unconstitutionally excessive. First, there was a clear need for the use of force. Garcia was firing a gun in the booking area of the police station and presented a serious danger to the police officers and prisoners in the station. Second, the amount of force used was proportionate to the need. Officer Fahey fired only one round at Garcia compared to many rounds fired by Garcia. Third, the actual injury to Garcia was relatively limited considering that he had shot a police officer and another prisoner.

Finally, there is absolutely no evidence that suggests that Officer Fahey's decision to use force was in bad-faith or "maliciously or sadistically for the very purpose of inflicting harm." Even assuming that the police officers' behavior enabled Garcia to get his hands on a weapon with the result that Officer Fahey needed to shoot Garcia to restore order, bad-faith cannot be inferred. Moreover, the officers' earlier behavior is not relevant to the issue of whether they used excessive force once Garcia began firing the gun at police officers and prisoners. Accordingly, the City

is entitled to summary judgment on Garcia's excessive force claim.

### ii) *Denial of Medical and Psychological Care*

The City moves to dismiss Garcia's claim that the City is liable for denying him adequate medical and psychological care. It argues that the claim fails to specify the custom, policy or practice that caused him to be denied medical assistance,[5] and, more importantly, Garcia has failed to present evidence sufficient to establish that a custom, policy or practice actually caused his constitutional injury.

Garcia responds that the City's policy for managing suicidal prisoners was inadequate and that the City neglected to train its police officers properly in the handling of suicidal pre-arraigned detainees. He alleges that: (1) there were no procedures for providing suicidal pre-arraigned detainees needed inpatient psychiatric care; (2) suicide proof cells were not available for pre-arraigned detainees; (3) guards were not required to monitor suicidal prisoners needing inpatient psychiatric care. He adds that the inadequacy of the policies and training is inferable from the fact that after Garcia returned to the station house from BCH he again attempted suicide by setting his clothes on fire and was able to get hold of a weapon. These alleged deficiencies, Garcia suggests, reflect the City's deliberate indifference to the constitutional rights of pre-arraigned suicidal detainees to necessary, adequate, reasonable medical and psychological care and render the City liable.

■ Although the right to medical care of a post-arrest, pre-trial detainee is grounded in the Due Process Clause of the Fourteenth Amendment, his right to such care is "at least as great as the Eighth Amendment protections available to a con-

victed prisoner." *City of Revere,* 463 U.S. at 244, 103 S.Ct. 2979 (citing *Bell,* 441 U.S. at 535 n. 16, 545, 99 S.Ct. 1861)).

■ The Eighth Amendment imposes a duty to attend to a prisoner's "serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The First Circuit has recognized that the Eighth Amendment's protections extend to an inmate's "serious mental health needs." *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991); *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558, 560 (1st Cir.1988). Government officials violate the Constitution if they are "deliberately indifferent" to those needs. *Estelle,* 429 U.S. at 104, 97 S.Ct. 285. However, negligence alone on the part of an official does not rise to the level of a constitutional violation. *Id.* at 106, 97 S.Ct. 285 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner").

Garcia's medical needs were serious. He had attempted suicide twice over the course of a 24 hour period. Moreover, a psychiatrist had determined that his condition warranted inpatient psychiatric care and prepared the necessary paperwork to commit Garcia. *See Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990) ("A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment."). Despite this diagnosis, Garcia was returned to the place where he had attempted suicide the evening before.

The City argues that police department's's decision to retrieve Garcia did not amount to deliberate indifference under the circumstances because: (1) DMH would not accept Garcia while charges were pending against him; (2) BPD could

---

**5.** The argument is without merit. Although the amended complaint makes no express assertions or references to an unconstitutional "custom, policy or practice," the allegations are sufficient to place the City on notice of the customs, policies and practices the plaintiff has relied upon in bringing this suit. *See*

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (rejecting a heightened pleading requirement for claims against municipalities under section 1983).

not drop the charges against Garcia because of the gravity of the alleged offenses; (3) because of the outstanding default warrant, Garcia was "non-bailable" absent appearing before a judge; and (4) BCH refused to allow Garcia to remain at the hospital under police guard because they were not equipped to handle inpatient psychiatric treatment. Garcia replies that alternative treatment options such as temporary admission to Bridgewater or the Sullivan Fuller Center were not explored.

 However, even assuming that BPD officials themselves violated Garcia's constitutional rights, it does not follow that the City is liable for Garcia's injury. Municipal liability under section 1983 is not premised on a theory of *respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A claim under section 1983 against a municipality is actionable only upon a showing that an unconstitutional custom or policy of the municipality was the cause of the injury and of the deprivation of constitutional rights. *Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir.1989).

 A municipality may be liable under section 1983 "for constitutional violations resulting from its failure to train municipal employees." *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *Canton*, the Court held that a municipality's failure to train its police officers adequately may render a municipality liable under section 1983, but only if the failure reflects a deliberate indifference to the constitutional rights of its citizens. *Canton*, 489 U.S. at 388, 109 S.Ct. 1197. To prove such a claim, a plaintiff must show that the city had "a policy of not taking reasonable steps to train ... employees" such that "the need for more or different training [was] so obvious, and the inadequacy so

likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably said to have been deliberately indifferent to the need." *Bordanaro v. McLeod*, 871 F.2d at 1159. The policy must be the result of a "deliberate" or "conscious choice."

 In the case at hand, BPD did have established rules and procedures for managing suicidal prisoners and prisoners in need of medical attention and the police officers involved in the detention of Garcia complied with these rules and procedures.[6] However, Garcia argues that the policies and procedures were inadequate because they did not address the circumstances of his case and permitted him access to matches and a weapon.

Although it is true that the City's policy did not address the precise facts of Garcia's case, this gap does not rise to the level of a constitutional violation. At best, the evidence in the record suggests that the omission was the result of oversight alone. Nothing in the record suggests that the City had a policy of denying suicidal pre-arraigned detainees adequate mental health care. There is no evidence from which to infer that the City was aware of the gap in its procedures and had failed to take steps to address it.

Nor is there any evidence indicating that there was an obvious need for the policy. There is also nothing in the record to suggest that the training received by the officers, regarding the unusual circumstances in Garcia's case, was likely to result in a constitutional deprivation. Likewise, no evidence in the record supports the conclusion that the City made a conscious or deliberate choice not to amend its policy or provide additional training to its police officers.

---

6. Section 13 of the policy mandates that seriously injured prisoners be taken to a medical center for treatment and that "any unusual appearance or behavior displayed ... receive immediate attention." Section 14 requires that police officers closely monitor those prisoners who attempt to harm themselves or threaten to harm themselves and directs the duty supervisor or person in charge to take all reasonable steps to prevent such an attempt including close monitoring of the prisoner in question.

Accordingly, the record contains no evidence supporting a finding that the City had a policy or custom that amounted to deliberate indifference to the medical and psychological needs of pre-arraigned detainees.

### 2. *Massachusetts Civil Rights Act (M.G.L. ch. 12, § 11I)*

The City also moves to dismiss Garcia's claim under the Massachusetts Civil Rights Act. The motion is granted. As the Supreme Judicial Court stated, with regard to the MCRA, in *Batchelder v. Allied Stores Corp., et al.,* 393 Mass. 819, 822–823, 473 N.E.2d 1128 (1985):

> We conclude that the Legislature intended to provide a remedy under G.L. 823 c. 12, § 11I, coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.

Accordingly, Garcia's claims under the Massachusetts Civil Rights Act fail for the reasons specified above with regard to his claims under 42 U.S.C. § 1983.

The complaint is dismissed.

It is so ordered.