# United States Court of Appeals

## For the First Circuit

No. 00-2369

JOSÉ O. GARCÍA,

Plaintiff, Appellant,

v.

CITY OF BOSTON, JOHN DOE, JOHN DOE, II,
BOSTON EMERGENCY SERVICE TEAM, AND
NEW ENGLAND MEDICAL CENTER HOSPITALS, INC.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, U.S. District Judge]

---

Before

Torruella, Chief Judge,

Campbell, Senior Circuit Judge,

and Bownes, Senior Circuit Judge.

---

William E. Gately, Jr., on brief, for appellant.
William J. Donahue, Assistant Corporation Counsel, with whom
Merita A. Hopkins, Corporation Counsel, were on brief, for appellee
City of Boston.
Alan B. Rindler, with whom Rindler Morgar, P.C. and Nadine Nasser
Donovan, were on brief, for appellees Boston Emergency Services Team
and New England Medical Center Hospitals, Inc.

June 12, 2001

**Per Curiam.** Appellant José O. García appeals a decision granting summary judgment in favor of appellees City of Boston ("City"), Boston Emergency Services Team ("BEST"), and New England Medical Center Hospitals, Inc. ("NEMC"). We affirm.

On August 19, 1994, García was arrested by the Boston Police Department ("BPD") after he was involved in a domestic disturbance. He was charged with violating Mass. Gen. Laws ch. 209A (threats of violence under Massachusetts Domestic Violence Law) and Mass. Gen. Laws ch. 265, § 13D (assault and battery upon police officers).[1] The BPD took him to the station, where he was booked and placed in a cell. Because García was arrested on a Friday night, he would not be arraigned until Monday morning.

That evening, García, in an apparent suicide attempt, made some superficial cuts to his wrist with the aluminum top of a juice container. An ambulance was called, but it was determined that García did not want nor need further medical treatment. He was then placed on the suicide list and handcuffed to the "suicide wall,"[2] located in the booking area.

---

[1] In addition to the new charges, García had an outstanding default warrant issued against him.

[2] The "suicide wall" was a bar in the booking area to which prisoners who were identified as suicide risks were handcuffed in order to more closely monitor them.

On Saturday evening, still handcuffed to the suicide wall, García somehow obtained matches and lit himself on fire. He was taken to Boston City Hospital ("BCH") where he received treatment for first and second degree burns. While at BCH, a resident psychiatrist evaluated García, and concluded that he was a suicide risk. Steps were taken to facilitate an inpatient admission to an area hospital. Because BCH did not have inpatient facilities, BEST[3] was contacted in order to locate an appropriate facility for García. García was uninsured, and therefore ineligible for admission into a private facility. His only option, then, was a Department of Mental Health ("DMH") center.

Accordingly, DMH Adjudicator Jim Galvin was contacted about admitting García to a facility. Galvin took the position that because García was under arrest and not yet arraigned, it would violate a DMH policy to admit him. In order to obtain admission, García had to either be arraigned or have the charges against him dropped. There was no judge available to arraign García. In addition, the BPD refused to drop the charges against García because of their severity. After an unsuccessful attempt by the BPD to persuade BCH to allow García to

---

[3] BEST is a program of the NEMC's Department of Psychiatry. Its stated function is to "provide timely, quantitative assessment and disposition for individuals in the Boston Area who require emergency psychiatric services."

stay, under police guard, until his Monday morning arraignment, García was returned to the station and handcuffed to the suicide wall.

Upon his return to the station, García again obtained some matches and lit his shirt on fire. The fire was quickly extinguished without injury. Shortly thereafter, Officer William Cullinane distributed lunches to the prisoners locked to the suicide wall. Somehow, García was able to remove Officer Cullinane's gun from his holster and began firing the weapon. Officer Cullinane and another prisoner on the suicide wall were shot by García before Officer Stephen Fahey shot García in the arm, causing García to drop Officer Cullinane's weapon.

García subsequently brought this suit against the City, alleging violations of his constitutional rights under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I. He later amended his complaint to include claims of negligence and breach of contract against BEST and the NEMC. The City, and BEST and NEMC collectively, moved for summary judgment, which the district court granted as to all claims. García v. City of Boston, 115 F. Supp. 2d 72 (D. Mass. 2000) (Mem. and Order).

Ruling on the City's motion, the district court held the following. As to García's excessive and unreasonable force claim, García failed to fulfill any of the requirements of the four-part test that the district court applied. See Johnson v. Glick, 481 F.2d 1028,

1033 (2d Cir. 1973), rejected on other grounds, Graham v. Connor, 490
U.S. 386 (1989). Specifically, the district court held that there was
"a clear need for the use of force" when Officer Fahey shot García in
the arm, namely because García was firing a gun and had already shot an
officer and a fellow prisoner. García, 115 F. Supp. 2d at 81. In
addition, that force was proportionate to the need, and, considering
the circumstances, García's injury was relatively minor. Id. Finally,
"there [wa]s absolutely no evidence" of bad faith on the part of
Officer Fahey or that his actions were taken "maliciously or
sadistically for the very purpose of inflicting harm." Id.

Even construing the material facts in the light most
favorable to García, Campbell v. Wash. County Technical Coll., 219 F.3d
3, 5 (1st Cir. 2000), we can perceive no construction of the evidence
that could sustain this claim. Without commenting on the appropriate
test to be employed when evaluating an excessive and unreasonable force
claim in these circumstances,[4] we affirm the holding of the district
court on this issue.

As to García's denial of medical and psychological care
charge, the district court first identified a "duty to attend to a

_____

[4] In declining to comment, we note only that neither the Supreme Court
nor this circuit have established a test for this factual scenario.
Compare Johnson, 481 F.2d at 1033 (test used above), with Bell v.
Wolfish, 441 U.S. 520, 535-37 (1979) (evaluating conditions of pre-
trial detention), and Evans v. Avery, 100 F.3d 1033, 1038 (1st Cir.
1996) (high speed police pursuits).

prisoner's 'serious medical needs.'" <u>García</u>, 115 F. Supp. 2d at 82 (quoting <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97, 104 (1976)). The court found that García's psychological problems constituted serious medical needs. <u>Id.</u> García, however, did not demonstrate that his failure to receive inpatient treatment was the result of "an unconstitutional custom or policy." <u>Id.</u> at 83. The BPD did have a policy for handling suicidal prisoners like García. It was García's unusual situation, of being uninsured and pre-arraignment, coupled with the DMH's policy of refusing to admit psychiatric patients who had not been arraigned, that resulted in García not being placed in a facility. "Deliberate indifference" to García's medical needs played no role in this incident. <u>Id.</u> at 82-83 (quoting <u>Estelle</u>, 429 U.S. at 104). Thus, García's § 1983 claim necessarily failed. <u>Id.</u> at 84.

We agree with the district court's reasoning and conclusion and affirm on that basis. We also affirm the district court's holding that García's failure to establish a § 1983 claim essentially equates to a failure to establish a claim under the Massachusetts Civil Rights Act. <u>Id.</u>

The district court also held that García's negligence and contract claims against BEST and NEMC could not be sustained. <u>Id.</u> at 77. García alleged two theories under negligence: medical malpractice and administrative negligence. The district court found that a medical malpractice claim was not viable, because García could not demonstrate,

as required by Massachusetts medical malpractice law, that a physician-patient relationship between García and either BEST or NEMC existed. Id. at 78. We agree. The administrative negligence claim is even weaker, and we affirm the district court's conclusion that neither BEST nor NEMC was negligent. Id. at 79.

Citing its prior holding that the DMH policy was the cause of García not being admitted to an inpatient facility, the district court concluded that BEST and NEMC fulfilled the terms of their services contract. As such, García's contract claim failed. Id. at 80. Again, we agree with the district court in this regard.

Having upheld the holdings of the district court in all respects, we **affirm** the granting of summary judgment and dismissal of this complaint.